UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 25-2090

SHANNON MACDONALD, M.D., PAUL GARDNER, M.D., J.A., a minor, by and
through guardian and next friend MICHAEL ABELL, MICHAEL ABELL, and
HANK JENNINGS,
*Plaintiff-Appellants*,

v.

S. CHETAN SHAH, M.D., in his official capacity as President of the New Jersey
State Board of Medical Examiners
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 23-CV-23044

## BRIEF OF APPELLEE S. CHETAN SHAH, M.D.

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

STEPHEN EHRLICH
*Deputy Solicitor General*

NATHANIEL F. RUBIN
FRANCIS X. BAKER
MICHAEL ANTENUCCI
*Deputy Attorneys General*

R.J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625-0112
(609) 789-2889
nathaniel.rubin@njoag.gov
Attorneys for Appellee

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ......................................................................iii

INTRODUCTION ......................................................................... 1

COUNTERSTATEMENT OF JURISDICTION ....................................... 3

COUNTERSTATEMENT OF ISSUES ON APPEAL .............................. 3

COUNTERSTATEMENT OF RELATED CASES ................................... 3

COUNTERSTATEMENT OF THE CASE........................................... 3

    A. New Jersey's Medical Licensure Rules. ................................. 3

    B. The Parties and Complaint...................................................... 6

    C. Dismissal By the District Court. ............................................ 8

SUMMARY OF ARGUMENT .................................................... 11

STANDARD OF REVIEW.......................................................... 15

ARGUMENT.............................................................................. 15

    I. The Licensure Requirement Does Not Violate the First
       Amendment. ......................................................................... 15

       A. The Licensure Requirement Is Subject to Rational-Basis
       Review...................................................................................... 16

       B. The Licensure Requirement Survives Rational-Basis
       Review or Intermediate Scrutiny. ..........................................29

    II. The Licensure Requirement Does Not Violate the Dormant
        Commerce Clause.................................................................35

       A. The Dormant Commerce Clause Does Not Apply Given
       the Lack of Economic Protectionism. ....................................36

i

B. The Licensure Requirement Satisfies *Pike*. ...................... 44

III. The Licensure Requirement Does Not Violate the Privileges and Immunities Clause .......................................................... 48

A. The Licensure Requirement Is Neither Discriminatory Nor Protectionist. ................................................................... 49

B. The Licensure Requirement Is Substantially Related to Important Government Interests. ......................................... 50

IV. The Licensure Requirement Does Not Violate the Fourteenth Amendment ....................................................... 52

CONCLUSION ...................................................................................... 55

CERTIFICATION OF BAR MEMBERSHIP ............................................ 56

CERTIFICATION OF COMPLIANCE ..................................................... 56

CERTIFICATION OF SERVICE ............................................................. 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*360 Virtual Drone Servs. LLC v. Ritter,*
102 F.4th 263 (4th Cir. 2024) ......................................................................31

*A.L. Blades & Sons, Inc. v. Yerusalim,*
121 F.3d 865 (3d Cir. 1997) .........................................................................48

*Barsky v. Bd. of Regents,*
347 U.S. 442 (1954) .....................................................................................33

*Brokamp v. James,*
66 F.4th 374 (2d Cir. 2023) ............................................................ 12, 33, 34

*Brown v. Hovatter,*
561 F.3d 357 (4th Cir. 2009) ........................................................... 39, 41, 42

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.,*
476 U.S. 573 (1986) .....................................................................................38

*Bruni v. City of Pittsburgh,*
941 F.3d 73 (3d Cir. 2019) ...........................................................................30

*Capital Assoc. Indus. v. Stein,*
922 F.3d 198 (4th Cir. 2019) ........................................................................34

*C & A Carbone, Inc. v. Town of Clarkstown,*
511 U.S. 383 (1994) .....................................................................................38

*Children's Health Defense, Inc. v. Rutgers,*
93 F.4th 66 (3d Cir. 2024) ............................................................................29

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC,*
596 U.S. 61 (2022) .......................................................................................19

*City of Philadelphia v. New Jersey,*
437 U.S. 617 (1978) ............................................................................... 45, 46

*Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd.,*
298 F.3d 201 (3d Cir. 2002) .........................................................................38

*Collins v. Texas*,
223 U.S. 288 (1912)............................................................20, 28

*CTS Corp. v. Dynamics Corp. of Am.*,
481 U.S. 69 (1987)....................................................................47

*Dean Milk Co. v. City of Madison*,
340 U.S. 349 (1951)..................................................................38

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
26 F.4th 1214 (11th Cir. 2022)................................................17

*Dent v. West Virginia*,
129 U.S. 114 (1889)............................................................*passim*

*Doe ex rel. Doe v. Governor of N.J.*,
783 F.3d 150 (3d Cir. 2015)........................... 14, 29, 52, 54

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
920 F.3d 421 (6th Cir. 2019)...................................................17

*Exxon Corp. v. Governor of Md.*,
437 U.S. 117 (1978)..................................................................40

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993)..................................................................29

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461, 470 (2025).................................................. 16, 17

*Gattineri v. Town of Lynnfield*,
58 F.4th 512 (1st Cir. 2023)....................................................52

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997)..................................................................45

*Goldfarb v. Va. State Bar*,
421 U.S. 773 (1975)..................................................................17

*Graves v. Minnesota*,
272 U.S. 425 (1926)..................................................................20

*Gunn v. Minton*,
568 U.S. 251 (2013)..................................................................24

*Heffner v. Murphy,*
745 F.3d 56 (3d Cir. 2014) ............................................................*passim*

*Hines v. Pardue,*
117 F.4th 769 (5th Cir. 2024) ....................................................9, 25

*Hunt v. Washington State Apple Advertising Commission,*
432 U.S. 333 (1977)....................................................................42, 43

*Huron Portland Cement Co. v. Detroit,*
362 U.S. 440 (1960)....................................................................35, 44

*James v. City of Wilkes-Barre,*
700 F.3d 675 (3d Cir. 2012) ...........................................................15

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.,*
650 F.3d 915 (3d Cir. 2011) ...........................................................53

*Just Puppies, Inc. v. Brown,*
123 F.4th 652 (4th Cir. 2024) ........................................................48

*Kalu v. Spaulding,*
113 F.4th 311 (3d Cir. 2024)..........................................................15

*Kassel v. Consol. Freightways Corp. of Del.,*
450 U.S. 662 (1981)....................................................................45, 47

*King v. Governor of N.J.,*
767 F.3d 216 (3d Cir. 2014) .......................................................18, 19

*Kleinsmith v. Shurtleff,*
571 F.3d 1033 (10th Cir. 2009).......................................................41

*Locke v. Shore,*
634 F.3d 1185 (11th Cir. 2011)...................................................41, 45

*Mazo v. N.J. Sec'y of State,*
54 F.4th 124 (3d Cir. 2022)..................................................12, 19, 22

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996).........................................................................51

*McBurney v. Young,*
569 U.S. 221 (2013).................................................................48, 49, 50

*McCullen v. Coakley,*
573 U.S. 464 (2014)............................................................12, 30, 34

*Minerva Dairy, Inc. v. Harsdorf,*
905 F.3d 1047 (7th Cir. 2018)...........................................................36

*Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Berch,*
773 F.3d 1037 (9th Cir. 2014).............................................................41

*Nat'l Assoc. for the Advancement of
Multijurisdiction Practice v. Castille,*
799 F.3d 216 (3d Cir. 2015) ......................................................*passim*

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
585 U.S. 755 (2018)..................................................................*passim*

*Nat'l Pork Producers Council v. Ross,*
598 U.S. 356 (2023)..................................................................*passim*

*N.J. Staffing All. v. Fais,*
110 F.4th 201 (3d Cir. 2024)......................................................35, 44

*Ohralik v. Ohio State Bar Ass'n,*
436 U.S. 447 (1978)..................................................................16, 21

*Owner Operator Indep. Drivers Ass'n, Inc. v. Pa. Turnpike Comm'n,*
934 F.3d 283 (3d Cir. 2019) ...........................................................48

*Paciulan v. George,*
229 F.3d 1226 (9th Cir. 2000)...........................................................52

*Pike v. Bruce Church, Inc.,*
397 U.S. 137 (1970)..................................................................*passim*

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
505 U.S. 833 (1992)..................................................................21, 25

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015)..................................................................16, 21

*Sammon v. New Jersey Board of Medical Examiners,*
66 F.3d 639 (3d Cir. 1995) ........................................................*passim*

*Sarasota Wine Market, LLC v. Schmitt,*
987 F.3d 1171 (8th Cir. 2021).........................................................52

*Schware v. Bd. of Bar Exam'rs,*
353 U.S. 232 (1957) ........................................................17

*Selevan v. N.Y. Thruway Auth.,*
584 F.3d 82 (2d Cir. 2009) .............................................52

*Sorrell v. IMS Health,*
564 U.S. 552 (2011) ........................................................21

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas,*
588 U.S. 504 (2019) ..................................................35, 36

*Tingley v. Ferguson,*
47 F.4th 1055 (9th Cir. 2022) .....................................17, 27

*Tolchin v. Supreme Court of New Jersey,*
111 F.3d 1099 (3d Cir. 1997) ..................................*passim*

*Toomer v. Witsell,*
334 U.S. 385 (1948) ........................................................51

*Troxel v. Granville,*
530 U.S. 57 (2000) ....................................................14, 52

*Truesdell v. Friedlander,*
80 F.4th 762 (6th Cir. 2023) ...........................................44

*United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v.
Mayor & Council of the City of Camden,*
465 U.S. 208 (1984) ........................................................48

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt.
Auth.,*
550 U.S. 330 (2007) ........................................................36

*Veterans Guardian VA Claim Consulting LLC v. Platkin,*
133 F.4th 213 (3d Cir. 2025) ...................................*passim*

*Vidal v. Elster,*
602 U.S. 286 (2024) ........................................................20

*Willman v. Att'y Gen. of the United States,*
972 F.3d 819 (6th Cir. 2020) ...........................................52

*Yerger v. Mass. Tpk. Auth.,*

395 F. App'x 878 (3d Cir. 2010) ............................................... 52

*Zahl v. Harper*,
  282 F.3d 204 (3d Cir. 2002) ..................................................... *passim*

## Statutes

28 U.S.C. § 1291 .......................................................................... 3

28 U.S.C. § 1331 .......................................................................... 3

28 U.S.C. § 1343 .......................................................................... 3

N.J. Stat. Ann. § 2C:21-20 ......................................................... 5

N.J. Stat. Ann. § 2C:43-3 ........................................................... 5

N.J. Stat. Ann. § 2C:43-6 ........................................................... 5

N.J. Stat. Ann. § 45:1-7.5 ..................................................... 5, 32

N.J. Stat. Ann. § 45:1-18.2 ......................................................... 5

N.J. Stat. Ann. § 45:1-23 ............................................................ 5

N.J. Stat. Ann. § 45:1-25 ............................................................ 5

N.J. Stat. Ann. § 45:1-61 ....................................... 6, 8, 26, 37

N.J. Stat. Ann. § 45:1-62 ................................................ *passim*

N.J. Stat. Ann. § 45:9-18 .......................................................... 26

N.J. Stat. Ann. § 45:9-19.17 ..................................................... 24

N.J. Stat. Ann. § 45:9-6 ................................................... 4, 5, 55

N.J. Stat. Ann. § 45:9-6.2 ................................................... 5, 32

N.J. Stat. Ann. § 45:9-12 ................................................... 5, 32

## Regulations

24 Del. Admin. Code § 1700-12.1 ............................................ 23

243 Mass. Code Regs. 2.07(16)(b) ........................................... 24

8 N.Y.C.R.R. § 59.12 ..................................................................24

8 N.Y.C.R.R. § 59.13 ..................................................................24

N.J. Admin. Code § 13:35-3.1 ......................................................4

N.J. Admin. Code § 13:35-3.11 ....................................................4

N.J. Admin. Code § 13:35-3.11A ..................................................4

N.J. Admin. Code § 13:35-3.12 ....................................................4

N.J. Admin. Code § 13:35-3.13 ....................................................4

N.J. Admin. Code § 13:35-6B.1 ....................................................6

N.J. Admin. Code § 13:35-6.13 ...............................................5, 32

N.J. Admin. Code § 13:35-6.15 ..................................................23

## Constitutional Provisions

U.S. Const. art. I, § 8................................................................35

U.S. Const. art. IV, § 2 .............................................................48

U.S. Const. amend. I.................................................................16

## Other Authorities

Pa. State Bd. of Medicine: Continuing Medical Education,
   https://tinyurl.com/4yavmafr (last visited Oct. 24, 2025) ...................23

## **INTRODUCTION**

This case presents a straightforward application of the longstanding legal rules governing the constitutionality of professional licensing measures. For well over a century, federal courts have recognized States' exceedingly strong interest in safeguarding public health through the exercise of their police powers. And States have consistently endeavored to achieve such public-health interests by regulating the medical profession within their borders, in particular through state licensure requirements for physicians who treat their residents. For good reason: ensuring that physicians obtain and maintain a license allows the States to ensure that these professionals maintain a baseline level of knowledge and competence as to the medical care they are providing. So given that history and those interests, federal courts have long afforded to the States discretion to maintain these reasonable licensure requirements.

Like myriad other States, New Jersey has long required physicians who provide medical care to patients within its borders to comply with its licensing requirements. It requires licensure for anyone who is treating an individual in New Jersey—no matter where the physician resides, and no matter where the physician is located. It requires licensure, too, irrespective of where else the physician practices—though it streamlines the process for practitioners who are already licensed in another State to more easily obtain a New Jersey license too. And it applies those requirements regardless of whether the care is being provided to New Jersey

1

patients in person or remotely via a video feed. That is, even as technology now allows healthcare providers to deliver their medical care virtually to patients—sometimes over great distances—New Jersey requires physicians to hold a New Jersey medical license if they provide telemedicine or telehealth to New Jersey patients. After all, the State wants to ensure the safety and competence of the medical care provided, no matter that a diagnosis or treatment plan is discussed on Zoom or in the office.

Appellants challenge this approach with a remarkable claim: that the Constitution requires New Jersey to allow out-of-state doctors to provide telemedicine or telehealth to New Jersey patients without obtaining a New Jersey medical license. But none of their claims withstand scrutiny. Their First Amendment claim fails because the licensing requirement—consistent with the Nation's long history of professional licensing rules—regulates the conduct of providing medical treatment with just incidental effects on speech, and is amply justified by the State's interests in ensuring the quality of medical care to its residents. The dormant Commerce Clause claim fails because the licensure requirement is not protectionist or discriminatory, and otherwise promotes important state interests with limited burdens on interstate commerce. The Privileges and Immunities Clause claim fails for similar reasons. And no other constitutional provision allows for the invalidation of such basic licensure rules. The federal courts have therefore repeatedly turned away such challenges to such reasonable and neutral licensing requirements. This

case should be no different. This Court should affirm the well-reasoned decision below.

## COUNTERSTATEMENT OF JURISDICTION

The district court had federal question jurisdiction under 28 U.S.C. §§ 1331, 1343. This Court has jurisdiction under 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF ISSUES ON APPEAL

Whether the district court properly dismissed the complaint for failure to state a claim.

## COUNTERSTATEMENT OF RELATED CASES

Appellee is not aware of any related cases pending within this circuit.

## COUNTERSTATEMENT OF THE CASE

### A.    New Jersey's Medical Licensure Rules.

New Jersey requires physicians to be licensed to practice medicine for its residents. As the Supreme Court has recognized for over a century, "it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). So, "for the protection of society," a state may "exclude from practice those who have not such a license, or who are found upon examination not to be fully qualified." *Id.* at 123. And protecting society by regulating—through licensing—the practice of medicine within the

State's borders is an interest federal and state courts alike have recognized as "exceedingly strong" and "paramount." *Zahl v. Harper*, 282 F.3d 204, 210–12 (3d Cir. 2002) ("The state regulation of the medical profession is in the public interest; power to establish and enforce health standards 'is a vital part of a state's police power.'").

In line with these interests, New Jersey has established a straightforward statutory scheme to ensure its residents are able to receive medical services from competent practitioners of good character. It requires that "persons commencing the practice of medicine or surgery in th[e] State shall apply to the board [of medical examiners] for a license so to do." N.J. Stat. Ann. § 45:9-6. For physicians who first become licensed in New Jersey, this typically requires passing a standardized national medical licensing examination, *see* N.J. Admin. Code § 13:35-3.1, providing for the completion of three years of post-graduate training such as a residency, *id.* § 13:35-3.11A(b), and submitting to a criminal background check, *id.* § 13:35-3.13.[1]

New Jersey requires all individuals treating New Jersey patients to obtain a license, regardless of where the physician resides; but it offers two accelerated paths to licensure for physicians already licensed in an-

---

[1] New Jersey imposes additional educational and post-graduate training standards for first-time applicants who did not complete a medical degree from a medical school with recognized accreditation. *See* N.J. Admin. Code §§ 13:35-3.11, -3.12.

other State. First, a practitioner licensed in another state with "substantially equivalent" standards can get licensed by submitting an application, undergoing a background check, demonstrating the other license "is valid, current, and in good standing," and paying the relevant application fees. N.J. Stat. Ann. § 45:1-7.5; N.J. Admin. Code § 13:35-6.13. Second, New Jersey recently entered the Interstate Medical Licensure Compact, under which eligible practitioners may—upon obtaining a letter of qualification from their "state of principal license" verifying eligibility and the satisfaction of a background check—obtain an expedited license to practice in New Jersey. N.J. Stat. Ann. § 45:9-6.2.

To ensure the efficacy of its licensure system, New Jersey forbids the practice of medicine without a license. Someone who "knowingly does not possess a license," and "engages in th[e] practice" of medicine in New Jersey anyway, is guilty of a third-degree crime and subject to criminal penalties. *Id.* §§ 2C:21-20, 2C:43-3(b)(1), -6(a)(3). New Jersey's Board of Medical Examiners is responsible for licensing medical practitioners, *id.* §§ 45:9-6, -12, and can order an unlicensed practitioner to "immediately cease and desist" treating patients in New Jersey, *id.* § 45:1-18.2(b)(1). The Attorney General can seek further civil remedies. *Id.* §§ 45:1-18.2(b)(2), -23, -25(a).

New Jersey extends these provisions to healthcare providers who care for New Jersey patients remotely. "Any health care provider who uses telemedicine or engages in telehealth while providing health care

services to a patient, shall ... be validly licensed ... to provide such services in the State of New Jersey." *Id.* § 45:1-62(b). The State defines "Telehealth" as "the use of information and communications technologies, including telephones, remote patient monitoring devices, or other electronic means, to support clinical health care, provider consultation, ... and other services." *Id.* § 45:1-61. "Telemedicine" is defined as "the delivery of a health care service using electronic communications, information technology, or other electronic or technological means to bridge the gap between a health care provider who is located at a distant site and a patient who is located at an originating site." *Id.* An originating site is where "a patient is located at the time that health care services are provided ... by means of telemedicine or telehealth." *Id.* A distant site is where a health care provider "is located while providing health care services by means of telemedicine or telehealth." *Id.* Either way, a health care provider working at a distant site must be "acting within the scope of a valid license ... issued pursuant to Title 45." *Id.*[2]

### B.  The Parties and Complaint.

Appellants challenge New Jersey's telehealth licensure rule. Shannon MacDonald, a Massachusetts resident, is a radiation oncologist at Massachusetts General Hospital who specializes in rare pediatric cancers and proton therapy. JA38 ¶ 7. Dr. MacDonald is a physician to Appellant

---

[2] Providers who merely consult with a licensee in New Jersey but do not direct patient care are not required to obtain licensure in New Jersey in order to provide such consultation. *See* N.J. Admin. Code § 13:35-6B.1(d).

J.A., a New Jersey resident, whose father is Appellant Michael Abell, another New Jersey resident. JA39 ¶¶ 9–10. J.A. needs annual scans to monitor his recovery from a pineoblastoma, for which Dr. MacDonald treated him as a young child; he and Mr. Abell want to use telemedicine to consult with Dr. MacDonald. JA44–45 ¶¶ 32–33.

Appellant Paul Gardner, a resident of Pennsylvania, is a neurosurgeon at the University of Pittsburgh Medical Center who specializes in skull base surgery. JA38–39 ¶ 8. Appellant Hank Jennings, a New Jersey resident, was diagnosed as a teenager with a tumor at the base of his skull. JA39 ¶ 11; JA46 ¶ 34. He traveled to Pittsburgh for four surgeries resecting his tumor. *Id.* ¶ 37. Those surgeries were successful, and Mr. Jennings needs periodic follow-ups with his specialists and would like to use telemedicine for those follow-ups. JA47 ¶¶ 40–41.

Drs. MacDonald and Gardner refuse to get licensed in New Jersey. Instead of applying for New Jersey medical licenses, JA47–48 ¶¶ 42–45, Appellants filed this suit to challenge the telehealth-licensing requirement.[3] JA34–66. All Appellants allege that the requirement violates the First Amendment and the dormant Commerce Clause. JA54–61 ¶¶ 69–77, 87–100. The doctors further allege that the requirement violates the Privileges and Immunities Clause. JA56–58 ¶¶ 78–86. And Michael Abell

---

[3] At the time of filing, the President of the New Jersey Board of Medical Examiners was Otto F. Sabando, D.O.; it is now S. Chetan Shah, M.D. The caption has been updated accordingly.

alleges that it violates his Fourteenth Amendment due-process right to direct his child's medical care, JA61–63 ¶¶ 101–109. Appellants sought a declaration that the requirement is unlawful as applied to them and an injunction restraining its enforcement against them. JA63–64.

### C.    Dismissal by the District Court.

On May 12, 2025, the district court granted the State's motion to dismiss, dismissing Appellants' Complaint without prejudice. JA4–33.

The district court began by recognizing that this case involves the regulation of medical treatment. Appellants repeatedly claimed that the telehealth services they provide New Jersey patients—including consultations and follow-ups—are not really "treatment," and that this should impact the constitutional analysis. JA13. But the district court rejected the premise, emphasizing that New Jersey defines telehealth as "the delivery of a health care service using electronic communications, information technology, or other electronic or technological means to bridge the gap between a health care provider who is located at a distant site and a patient who is located at an originating site," which "unambiguously includes 'provider consultation.'" JA13–14 (citing N.J. Stat. Ann. § 45:1-61). And the district court rejected the notion that medical consultations and physician follow-ups should be distinguished from "other forms of treatment" for constitutional purposes. JA14.

The district court then rejected each of Appellants' four constitutional claims. As to Appellants' First Amendment claims, the court found

that rational-basis review applied, relying on this Court's decision in *National Association for the Advancement of Multijurisdiction Practice v. Castille*, 799 F.3d 216 (3d Cir. 2015), which subjected analogous attorney licensing requirements to such review. JA24–26. The district court emphasized that just like such attorney licensing requirements, this licensure rule for physicians "does not dictate what a physician can and cannot say, but rather sets forth a requirement that those practicing telemedicine within New Jersey be licensed in New Jersey," and added that no speech is targeted based on its content or the speaker's viewpoint." JA25–26. The district court was unpersuaded by Appellants' reliance on *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213 (3d Cir. 2025), and *Hines v. Pardue*, 117 F.4th 769 (5th Cir. 2024), which the court found to be inapposite and inapplicable to neutral professional licensing. JA26–29. Because it was "clear … from the pleadings that Section 45:1-62(b) is rationally connected to physicians' fitness and capacity to practice," the district court concluded that further "development of the factual record [was] unnecessary" and that Appellants' First Amendment claim warranted dismissal. JA29–30.

The district court dismissed the dormant Commerce Clause claim as well. The district court began by finding that this telehealth licensure requirement was not protectionist or discriminatory. Relying on *Heffner v. Murphy*, 745 F.3d 56 (3d Cir. 2014), and *Tolchin v. Supreme Court of New Jersey*, 111 F.3d 1099 (3d Cir. 1997), the district court held that this

9

measure "unquestionably" "fall[s] equally on New Jersey and out-of-state physicians." JA15–16. As a result, the district court proceeded to the balancing test under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), inquiring "whether the [law's] burdens on interstate commerce substantially outweigh its putative local benefits." JA17. The district court identified New Jersey's strong interest in regulating the practice of medicine within its borders, and contrasted that to the incidental impacts on interstate commerce—impacts that reflected "the size and nature of [Appellants'] practices," rather than an effort by New Jersey to disfavor doctors who practice in other States. JA18. The court could not "conclude that the burdens associated with Section 45:1-62(b)'s requirement that those seeking to practice telemedicine in New Jersey be licensed in New Jersey substantially outweigh the local benefits." JA18–19.

Turning to Appellants' Privileges and Immunities claim, the district court detected "similar flaws as [Appellants'] dormant Commerce Clause claim." JA21. Again citing *Castille*, the court assessed both "whether Section 45:1-62(b) discriminates against nonresidents and []if it does, whether its imposition is too heavy a burden on the privileges of nonresidents and it bears a substantial relationship to the state's objective." JA20. The district court first rejected any claim of discrimination, concluding that the licensing rule "treats New Jersey residents no differently than residents of other states." JA21. And it again found that "New Jersey has a strong interest in regulating the practice of medicine" and

"that requiring state licensure in order to practice telemedicine bears a substantial relationship to that interest and does not impose too heavy a burden on nonresidents who wish to practice in New Jersey." JA22.

Finally, the district court addressed Appellants' substantive due process claim. It concluded that *Sammon v. New Jersey Board of Medical Examiners*, 66 F.3d 639 (3d Cir. 1995), was "directly on-point and controls [the] analysis." JA31–32. Based on *Sammon*'s holding that "'parents have no constitutional right to their choice of a health care provider who does not meet quality control standards that a legislator might reasonably conceive to be desirable,'" the district court applied rational-basis review. JA32 (quoting 66 F.3d at 647). Accepting that the Legislature could rationally determine that requiring a New Jersey license to practice telemedicine for New Jersey patients served the State's interest in safeguarding the health and safety of its public, the rule survived rational-basis review. JA32–33.

This appeal followed.

## SUMMARY OF ARGUMENT

Because all of Appellants' claims fail as a matter of law, the district court properly dismissed Appellants' complaint.

**I.A.** The licensure requirement does not violate Appellants' First Amendment rights. Initially, this Court has already made clear that neutral professional regulations, which ensure basic competency and character, are subject only to rational-basis review. *Castille*, 799 F.3d at 221 (so

finding for regulation of attorneys). That rule applies fully to the medical licensure provision at issue here. The licensure requirement is neither a content- nor speaker-based restriction on speech; instead, the licensure requirement governs the provision of medical care in New Jersey, based on the competence and knowledge of the physician, and does not regulate the content or views of the professional's practice. Indeed, to the extent that the licensure rule requires any examination of speech at all, it does so only incidentally in service of "neutral" regulation over the competence of medical care provided to New Jerseyans, and "unrelated to the message conveyed." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 149 (3d Cir. 2022). Appellants fail to offer persuasive reasons to distinguish regulation of the legal and medical professions. To the contrary, regulation of the medical profession even with incidental effects on speech is consistent with nearly a century-and-a-half of Supreme Court case law.

**B.** The licensure rule survives either rational-basis review or intermediate scrutiny. The rule is straightforwardly related to New Jersey's interest in ensuring that physicians are competent and of good character. That interest is not just legitimate—it is "exceedingly strong." *Zahl*, 282 F.3d at 210–11. And the licensure rule need not be the "least restrictive" or "least intrusive" means to achieve these classic state interests. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). So just as the Second Circuit recently upheld a licensure requirement to provide talk therapy by telemedicine to New York patients, *see Brokamp v. James*, 66 F.4th 374 (2d

Cir. 2023), this Court should uphold this licensure requirement even if it applies intermediate scrutiny.

**II.A.** Nor does the licensure requirement violate the dormant Commerce Clause. The licensure requirement has none of the protectionist or discriminatory structure or effects that the dormant Commerce Clause guards against. Any physician who provides medical care to New Jersey patients—whether via telemedicine or otherwise—requires a New Jersey license. That includes physicians who live in and outside of New Jersey; the physician's residency is irrelevant to the statute. And it includes practitioners regardless of whether they are licensed in other States—and if anything, makes it *easier* to get a New Jersey license when the physician has a preexisting licensed practice in another State. The law's purported burdens on interstate commerce are therefore even less restrictive than the other licensing requirements this Court has held withstand similar challenges. *See Tolchin*, 111 F.3d at 1106–11; *Heffner*, 745 F.3d at 70–76.

**B.** The licensure rule also easily survives *Pike* balancing, because the burdens of licensure on interstate commerce do not substantially outweigh its local benefits. After all, the benefits involve ensuring that physicians providing care to New Jersey residents can meet baseline standards of character and competence—which promote the State's powerful interests in its residents' health. And the burdens are slim, particularly given the streamlined process New Jersey maintains for physicians who

have met similar standards in other States. *Pike* serves to smoke out hidden protectionism, but this rule regulates even-handedly to achieve New Jersey's strong interest in regulating the practice of medicine.

**III.** The licensure rule also satisfies the Privileges and Immunities Clause. The rule does not even implicate the Clause, because it does not discriminate on the basis of residency—just as the licensure requirement does not discriminate for purposes of the dormant Commerce Clause. And regardless of whether the rule is discriminatory, it does not impose a disproportionately heavy burden on nonresidents in light of New Jersey's interest in regulating its medical profession. The licensure rule is, if anything, *less* burdensome than other laws this Court has upheld against similar challenges, including New Jersey's in-state office requirement for lawyers. *See Tolchin*, 111 F.3d at 1107–08, 1113.

**IV.** The licensure rule does not offend the Fourteenth Amendment either. Whatever right Mr. Abell has to direct the "care, custody, and control" of his child J.A., *Troxel v. Granville*, 530 U.S. 57, 65 (2000), this Court's precedents foreclose reading that right to create an entitlement to any particular physician or course of medical care regardless of licensure. *See Sammon*, 66 F.3d at 156; *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150 (3d Cir. 2015). As a result, the proper standard of review for the licensure rule is the rational-basis test—which the rule handily survives.

14

## STANDARD OF REVIEW

This Court reviews "de novo a district court's ruling granting a motion to dismiss." *Kalu v. Spaulding*, 113 F.4th 311, 324 (3d Cir. 2024). In doing so, the Court accepts "the factual allegations contained in the Complaint as true," but "disregard[s] rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

## ARGUMENT

**I.   The Licensure Requirement Does Not Violate The First Amendment.**

Appellants have not shown a violation of their First Amendment rights. The challenged licensure requirement is a quintessential content-neutral licensing requirement that must only survive rational-basis review. *See Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Castille*, 799 F.3d 216, 221 (3d Cir. 2015). That remains true after *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) (*NIFLA*), and *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213 (3d Cir. 2025). But regardless of whether rational-basis review or intermediate scrutiny applies, the licensure requirement survives. Indeed, Appellants' own medical practice falls squarely within the scope of professional conduct that can be and always has been subject to reasonable regulation and licensing requirements.

15

**A.  The Licensure Requirement Is Subject To Rational-Basis Review.**

Appellants misunderstand the relevant level of scrutiny. The First Amendment protects the "freedom of speech" from government censorship. U.S. Const. amend I. So "[a]s 'a general matter,'" the First Amendment "'means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 470 (2025). "Content-based laws—those that target speech based on its communicative content—are" therefore "presumptively unconstitutional" and subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

But other laws receive a lower level of scrutiny. Content-neutral speech regulations, which do target speech but not because of its message, its ideas, its subject matter, or its content, "'are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.'" *Free Speech Coal.*, 606 U.S. at 471. And other laws address conduct, including "regulations of 'professional conduct,'" that only "'incidentally involve[] speech.'" *Veterans Guardian*, 133 F.4th at 220; *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (noting it has "never been deemed an abridgment of freedom of speech" to make certain "conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed").

Those types of restrictions "are subject only to rational-basis review, the minimum constitutional standard that all legislation must satisfy." *Free Speech Coal.*, 606 U.S. at 471.

Rational-basis review applies here. This Court, and its sister circuits, have repeatedly held "content-neutral licensing requirement[s]" for traditionally regulated professions are valid under the First Amendment if rationally connected with a professional's "fitness or capacity to practice the profession." *Castille*, 799 F.3d at 221. That distinction is rooted in the longstanding principle that States may impose "standards for licensing practitioners and regulating the practice of professions" as "part of their power to protect the public health, safety, and other valid interests." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975); *see Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 239 (1957) (allowing "high standards of qualification" for applicants to practice law). For that reason, circuits have consistently applied rational-basis review to uphold regulations on the practice of a wide range of professions. *See, e.g.*, *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1225–26 (11th Cir. 2022) (applying rational-basis review to licensing for dieticians and nutritionists); *Tingley v. Ferguson*, 47 F.4th 1055, 1077–78 (9th Cir. 2022) (rational-basis review for law regulating conversion therapy); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 429 (6th Cir. 2019) ("First Amendment heightened scrutiny does not apply to incidental regulation of professional speech that is part of the practice of medicine").

*Castille* is particularly instructive. There, this Court upheld a Pennsylvania rule that allowed attorneys barred in reciprocal states to be admitted by motion without taking the State's bar examination, 799 F.3d at 218, 221, rejecting the argument that the rule a constituted content-based restriction on speech, *id.* at 220–21. The rule instead was consistent with a long tradition of threshold regulations on the ability to practice professions generally, which themselves do not "restrict[] what a professional can and cannot say." *Id.* at 221. As such, rather than a "prohibition or other restriction" on speech, Pennsylvania's rule constituted a "content-neutral licensing requirement" of the sort that has traditionally received rational-basis review. *Id.*

For three independent reasons—especially when taken together—New Jersey's licensure scheme falls well within this legal tradition, and thus does not warrant any form of heightened scrutiny. First, and most fundamentally, this licensure requirement is not a content- or speaker-based restriction at all. *Contra* App. Br. 30–38. The licensure requirement "does not discriminate on the basis of the subject matter or viewpoint of any" doctor's speech, the "area" of medicine a doctor practices, or the patients a doctor would treat. *Castille*, 799 F.3d 220–21. Nor is New Jersey "even aware of the views of the Appellants or any other" doctor, or of what doctors "will say or do" in their medical practices. *Id.*[4] Instead, just as in

---

[4] In this way, this case presents an even easier question than the statute this Court upheld in *King v. Governor of N.J.*, 767 F.3d 216 (3d Cir. 2014).

*Castille* and other professional licensure cases, the statute just requires physicians to be licensed—here, regardless of whether their practice is in person or by Zoom, and regardless of their views on certain care.

Second, this law regulates the provision of medical care—and only incidentally governs speech "in service of drawing" neutral lines governing such care. *City of Austin v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 69, 71 (2022). This Court has explained that "neutral line-drawing" may "distinguish[] between speech based on its function or purpose without indirectly regulating subject matter." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 149 (3d Cir. 2022). And "neutral line-drawing" may be "based on extrinsic features unrelated to the message conveyed," even if doing so requires an examination of communicative content "to determine whether" a requirement applies at all. *Id.* So to the extent this licensure requirement restricts speech at all, it simply looks at whether doctor-patient communications are offered in the context of telemedicine; it says nothing about what message a doctor may convey. In that way, even the most restrictive interpretation of the licensure requirement reveals that it is not a content-based restriction but "neutral line-drawing" around professional conduct—just like regulation of law. *See id.*; *Castille*, 799 F.3d at 220–21.

---

That law constitutes an outright prohibition on providing sexual orientation change efforts to minors under 18. *See id.* at 220. This law is merely a requirement to obtain a license to provide care.

Third, that this licensure requirement falls within the long "history and tradition" of regulations to control who can practice medicine reinforces that heightened scrutiny of this content-neutral measure is inapplicable. *See, e.g., Vidal v. Elster*, 602 U.S. 286, 295–301 (2024) (suggesting even content-based measures would not be subject to heightened scrutiny where they are consistent with sufficient history and tradition). Medical licensure has ancient roots: fifteenth-century English doctors petitioned Parliament to exclude unlicensed practitioners, and Parliament established the Royal College of Physicians to do so in 1518. *See Veterans Guardian*, 133 F.4th at 224–25 (Krause, J., concurring). The medical profession was "among the first to be licensed and regulated" in early America, with modern licensing requirements for physicians predominant among the States by the late-nineteenth century. *Id.* at 225 & n.8. And the Supreme Court has upheld such requirements for nearly a century-and-a-half. *See Dent v. West Virginia*, 129 U.S. 114, 122–23 (1889) (licensure requirement for medicine generally); *see also Graves v. Minnesota*, 272 U.S. 425, 427 (1926) (a State may "prescribe that only persons possessing the reasonably necessary qualifications of learning and skill shall practice medicine or dentistry"); *Collins v. Texas*, 223 U.S. 288, 296–97 (1912) (licensure requirement for osteopathy). For all these reasons, heightened scrutiny is unwarranted.

Appellants' smorgasbord of responses fall short. *See* App. Br. 31–38. For example, Appellants argue that there is a general "presumpti[on]"

that the licensure requirement gets strict scrutiny when a healthcare provider speaks to a patient about the "particular subject matter" of medical care. App. Br. 30–31 (quoting *Reed*, 576 U.S. at 163); *see also Sorrell v. IMS Health*, 564 U.S. 552, 564 (2011). But that presumption does not apply to professional licensing requirements. The Supreme Court's longstanding decisions in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) and *Ohralik*—which upheld regulations that "targeted certain subject matter in the context of regulating a particular profession"—confirm that regulations on professional conduct which only "incidentally burden speech" are "excepted from the demands of strict scrutiny." *Veterans Guardian*, 133 F.4th at 224 (Krause, J., concurring) (citing *NIFLA*, 585 U.S. at 767–68). And *NIFLA* itself is clear that States may impose "regulations of professional conduct that incidentally burden speech." 585 U.S. at 769.

Appellants' efforts to distinguish *Castille* fall particularly short. App. Br. 33–37. Appellants first contend that unlike a challenge to restrictions on legal practice—which has communicative and non-communicative aspects—they only contest the licensure requirement insofar as it applies to their speech with patients about "treatment options and concerns." App. Br. 33. But just like law, the practice of medicine has communicative and non-communicative aspects. *See supra* at 6–7. Doctors, including Appellants in this case, analyze patients' conditions and then use that analysis to provide medical advice. *See id.* They might physically

21

administer the first dose of a medicine, and then instruct a patient on how to self-administer future ones. And they provide patient-specific answers to health questions based on their knowledge and experience both of their own patients and medical science writ large. So just because Appellants only challenge their inability to practice communicative aspects of medicine without a license does not change the constitutionality of a licensure requirement that applies to the practice of medicine overall and thus affects speech only incidentally. Next, Appellants note that *Castille* was decided on summary judgment, App.Br.33–34, but nothing in *Castille*'s analysis turned on any underlying facts. Appellants then call *Castille* inapplicable because this licensure requirement purportedly "targets conversations based on the topic of the speech and the identities of the speaker[]." App.Br.34 But this repeats the same mistakes as before, misunderstanding the kind of conduct around which the state statute is drawn. *See supra* at 18–19. The licensure requirement is the kind of "neutral line-drawing" that is not a content-based restriction. *Mazo*, 54 F.4th at 149.

Appellants also err in claiming that *Castille* cannot apply because the practices of law and medicine themselves are different. While *Castille* itself addressed law licensure, the district court correctly applied its logic and reasoning to medical licensure as well. After all, like the legal profession, the "long tradition of professional licensing schemes in our law dates back well before the Founding," and extends to medical licensure

as well. *Veterans Guardian*, 133 F.4th at 224–25 (Krause, J., concurring). The Supreme Court has likewise long upheld state licensing requirements to practice medicine—which exist all across the Nation—as "depend[ing] primarily upon the judgment of the state as to their necessity" so long as they have some "relation to such calling or profession." *Dent*, 129 U.S. at 122.

Appellants get no further by arguing that in medicine, purportedly unlike for law, "national standards of care apply." App. Br. 35. In contrast to Appellants' view that professional regulation for medicine is a one-size-fits-all approach, "regulating matters of health" has always been "among the historic police powers of a state," and "such regulation is primarily a matter of local concern." *Zahl v. Harper*, 282 F.3d 204, 211 (3d Cir. 2002). Nor are interstate differences trivial. New Jersey's regulations include, for example, some of the most rigorous continuing medical education (CME) requirements in the country, mandating that physicians receive an additional 100 hours of training every two years, including specialized training in end-of-life care, opioids and pain management, and in many cases, maternal health and cultural competence. *See* N.J. Admin. Code § 13:35-6.15. Pennsylvania directs physicians spend their time differently,[5] while Delaware mandates just 40 hours every two years, 24 Del. Admin. Code § 1700-12.1, and New York only requires limited specialized

---

[5] *See* Pa. State Bd. of Medicine: Continuing Medical Education, https://tinyurl.com/4yavmafr (last visited Oct. 24, 2025).

courses, *see* 8 N.Y.C.R.R. §§ 59.12, 59.13. Nor do the distinctions end there: New Jersey requires physicians to carry malpractice insurance of $1 million per claim and $3 million per policy year, N.J. Stat. Ann. § 45:9-19.17(a), while Massachusetts requires a tenth that amount, 243 Mass. Code Regs. 2.07(16)(b). And malpractice claims themselves are a classic example of States' "special responsibility for maintaining standards among members of the licensed professions." *Gunn v. Minton*, 568 U.S. 251, 264 (2013). This is no basis to distinguish attorneys either.

Unable to distinguish *Castille*, Appellants wrongly argue that subsequent cases undermine it. But the opposite is true: *Castille*'s rational-basis standard for licensing requirements is reinforced by the Supreme Court's decision in *NIFLA* and this Court's decision in *Veterans Guardian*. *NIFLA* rejected the notion that "professional speech" is "a separate category of speech that is subject to different rules." 585 U.S. at 767. *NIFLA* accepted, however, that States may implement "regulations of professional conduct that incidentally burden speech." *Id.* at 769. And *Veterans Guardian* acknowledged the same. *See* 133 F.4th at 220 (*NIFLA* preserves exception for "regulations of 'professional conduct, even though that conduct incidentally involves speech.'"). It is in that capacity that States can, for example, impose liability for professional malpractice or mandate informed-consent requirements. *See NIFLA*, 585 U.S. at 769–70.

*NIFLA* and *Veterans Guardian* thus support applying *Castille* here. Unlike the accreditation requirement at issue in *Veterans Guardian*, there is no dispute that the licensure requirement here is, in fact, a licensing scheme. *See* 133 F.4th at 221. Nor does the licensure requirement "regulate[] speech as speech." *NIFLA*, 585 U.S. at 770. Instead, the requirement provides that any health care provider who "uses telemedicine or engages in telehealth while providing health care services to a patient" shall be licensed to provide those services in New Jersey, subject to regulation by the appropriate New Jersey licensing body or regulatory entity, comply with New Jersey professional liability insurance requirements, and remain subject to New Jersey jurisdiction. N.J. Stat. Ann. § 45:1-62(b). And insofar as it reaches speech acts between doctor and patient, it does so "as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State." *NIFLA*, 585 U.S. at 770 (quoting *Casey*, 505 U.S. at 884).

Nor do Appellants get any further relying on *Hines v. Pardue*, 117 F.4th 769 (5th Cir. 2024)—an inapposite case that does not bind this Court. That case involved a licensed professional facing *additional* barriers on their ability to practice, whereas Appellants are unlicensed in New Jersey and seek to bypass the licensure entirely to treat patients in this State. *Id.* at 771. And under the licensure requirement, "telemedicine" occurs where a physician partakes in "the delivery of a health care service

25

using electronic communications, information technology, or other electronic or technological means to bridge the gap" between a remote doctor and patient. N.J. Stat. Ann. §45:1-61. So it is not the case that "communication of a message," 117 F.4th at 778, rather than the practice of medicine more generally, triggers the licensure requirement challenged here.

Appellants offer no other compelling arguments for greater scrutiny here. They argue that the licensure requirement restricts speech because it applies to conversations between Drs. MacDonald and Gardner and their patients. App. Br. 26–28. But that is irrelevant: as explained above, rational-basis review applies to laws that have an incidental effect on speech as part of regulating practice while heightened scrutiny covers laws that regulate "speech as speech." *NIFLA*, 585 U.S. at 770. Appellants, by their own admission, challenge the licensure requirement's applicability to their use of telemedicine to "discuss symptoms, health history, and diagnoses with potential patients and check in with patients about recovery and other ongoing concerns after in-person treatment." App. Br. 27. Those acts all fall within New Jersey's definition of the practice of medicine, and Appellants do not contend otherwise. *See* N.J. Stat. Ann. §45:9-18 ("[a]ny person shall be regarded as practicing medicine and surgery … who shall either offer or undertake by any means or methods to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition"). Indeed, Appellants seem to con-

26

cede that the "practice of medicine" can include "health-related educa-tion, public health, health administration, and other services." App. Br. 24–25. In other words, far from challenging a rule that controls what they can say to patients, Appellants challenge a licensure require-ment that applies to them regardless of whether or how they speak.

Appellants then attempt to spin a new distinction, distinguishing "treatment-speech" (that they say States can regulate) from other speech (that they say States cannot). *See* App. Br. 23–24. But that distinction is inapposite and incorrect. Appellants' cited Ninth Circuit case recognizes that certain types of speech acts—like talk therapy—are themselves medical "treatment," so there is an *additional* basis to directly (rather than incidentally) regulate the content of that speech. *See Tingley*, 47 F.4th at 1079–84. Under *Tingley*, then, Washington could bar conversion therapy for minors on the ground that therapy is itself treatment, so Washington could impose a content-based restriction against it. *Id.* at 1080. Yet contrary to Appellants' argument that *only* treatment speech can be subject to rational-basis review, *Tingley* proves the opposite: it expands the scope of rational-basis review, rather than restricting it. If a State can directly control the content of "treatment-speech," that does not undermine—and indeed, only reinforces—that an entirely neutral licens-ing scheme like New Jersey's is allowable. *See* N.J. Stat. Ann. §45:1-62(b). Because the licensure rule is directed to conduct rather than speech—requiring only that the practice of telemedicine (like all other

medicine) be licensed—an alleged distinction between treatment speech and other speech is irrelevant here.

Such a standard would also be unadministrable. Courts would need to parse every speech act to determine whether or not the speech constituted treatment. And that task is nearly an impossible one: a doctor's role is not simply to physically administer treatment, but also "to detect readily the presence of disease, and prescribe appropriate remedies for its removal," while "[e]very one may have occasion to consult him." *Dent*, 129 U.S. at 122. In other words, speech acts like diagnosis, prescription, and consultation are fundamental to medical practice, constituting part of the "claim to greater science" that makes a physician "something more than a nurse or a masseur." *Collins*, 223 U.S. at 297. It is unclear how the judiciary could ever divide up these responsibilities to decide which can be subjected to this neutral licensure scheme, and which could not. A doctor's instructions to take an over-the-counter drug like aspirin, a verbal assessment of a patient's skin mole as benign or threatening, or a written referral to a specialist all involve speech, and all are integral to a course of medical care—but they are also, in some sense, "consulting." So whether they constitute "treatment" or speech is a harder, context-dependent question, one the judiciary is not well situated to answer in case after case.

Finally, Appellants' attempt to cast the First Amendment question in terms of patients' "right to hear and receive information" does not

change the analysis of what scrutiny the licensure requirement should receive. App. Br.29–30. "The listener's right to receive information is reciprocal to the speaker's right to speak." *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015). As a result, a restriction that does not violate a speaker's right to speak similarly does not violate a listener's right to receive information. *Id.* It is thus unnecessary to separately analyze J.A.'s, Jennings's, and Abell's right-to-receive claim.

**B.    The Licensure Requirement Survives Rational-Basis Review or Intermediate Scrutiny**.

The licensure requirement easily survives either level of scrutiny. New Jersey has a strong and well-recognized interest in regulating its medical profession, promoting public health, and ensuring medical providers' accountability. The licensure requirement is not only reasonably related those interests, but advances them without burdening substantially more speech than necessary to do so.

Begin with rational-basis review. To prevail, Appellants must "negat[e] every conceivable basis which might support [the rule], whether or not the basis has a foundation in the record." *Castille*, 799 F.3d at 221; *see FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."); *Children's Health Defense, Inc. v. Rutgers*, 93 F.4th 66, 83–88 (3d Cir. 2024) (conducting rational-basis review at the pleading stage). Appellants do

not dispute that New Jersey has an interest in protecting health and safety by ensuring the competence of practitioners who provide medical care to its residents. *See, e.g.*, *Dent*, 129 U.S. at 122–23. Nor do Appellants argue that the licensing of telemedicine practitioners is unrelated to that end: the Legislature determined a New Jersey license was beneficial to ensure the competence of telemedical services in the State, and it set neutral baseline licensing requirements (that focus on educational background, demonstrated knowledge, and character) to achieve those goals. *See supra* at 3–6.

Even if intermediate scrutiny applies, the licensure requirement still meets it. That test asks whether the State's interest is "substantial" and whether the law is "sufficiently drawn to achieve it." *NIFLA*, 585 U.S. at 773; *see Bruni v. City of Pittsburgh*, 941 F.3d 73, 88 (3d Cir. 2019). There is no debate about New Jersey's interest in regulating the practice of medicine within its borders. That is not just substantial but "exceedingly strong." *Zahl*, 282 F.3d at 211. The only remaining inquiry concerns tailoring. On that score, the law need not employ the least restrictive means of achieving its goal; it just "must not burden substantially more speech than is necessary." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014); *see Bruni*, 941 F.3d at 89 (a regulation "need not be the least restrictive or least intrusive means of serving the government's interest," "and we 'afford some deference to a [State's] judgment in adopting a content-neu-

tral restriction on speech" (cleaned up)). And where restrictions are "primarily aimed at professional conduct and only incidentally burden speech," courts do not require "actual evidence," but instead, just "a sensible result" that the restriction is "'sufficiently drawn' to protect 'a substantial state interest.'" *360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 277–78 (4th Cir. 2024).

The licensure requirement readily satisfies that standard as part of the State's longstanding effort to ensure practitioner competence. By requiring that telemedicine providers meet the same licensing standards as other New Jersey physicians, the requirement ensures telehealth providers meet state standards to protect patients, like those with cancer, from sub-standard care. The same goes for the other requirements of section 45:1-62(b), which ensure that physicians in New Jersey remain accountable for disciplinary and malpractice purposes. *See id.* After all, it matters little to patient care whether a substandard doctor erroneously diagnoses the patient in person or by Zoom.

Appellants' claim to alternatives fares no better. Appellants assert that the existence of alternative requirements like "applying the rule only to video calls or verifying that the out-of-state physician-specialist is in fact licensed through their home state's medical board" suffice to show that the licensure requirement "burdens more speech than necessary." App. Br. 39. But strict "necessity" is the wrong standard here—New Jersey has some room for judgment. And neither of these alternatives would

31

equally satisfy the State's health-and-safety interests. The former makes little sense on its face. Limiting application of the licensure rule to telehealth interactions occurring over video is unrealistic because it would allow potentially unqualified providers to administer health care services to New Jersey residents via audio calls, evading any meaningful oversight. *See* App. Br. 39. Appellants do not confront this problem at all.

The latter alternative—that the State, by constitutional law, must simply defer to the judgment of another State's medical board—flies in the face of this Nation's long tradition allowing States to make their own calls (for lawyers and doctors alike) regarding which professionals can provide care to the patients in their States. *See supra* at 20. But it is a particularly strange argument here, where New Jersey *did* agree to streamlined licensure for practitioners admitted in other States. Physicians licensed in States with "substantially equivalent" standards can obtain a New Jersey license with an application, a background check, validation of the other license, and a processing fee. N.J. Stat. Ann. § 45:1-7.5; N.J. Admin. Code § 13:35-6.13. And for physicians with licenses from reciprocal States under the Interstate Medical Licensure Compact—itself containing education and character requirements for physicians—licensure is more expedited still. N.J. Stat. Ann. § 45:9-6.2. These procedures reflect the Legislature's legitimate judgment that physicians licensed in other States be required to demonstrate good character and basic quali-

fication to practice while protecting New Jersey residents against incompetent or deceptive physicians. *See Dent*, 129 U.S. at 122–23; *Barsky v. Bd. of Regents*, 347 U.S. 442, 449–51 (1954) (state can establish standards of conduct for medical practitioners).

The Second Circuit's decision in *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023), is instructive. Like New Jersey, New York requires that mental health telemedicine providers be licensed in the State. *See id.* at 382. And like New Jersey, New York allows mental health providers licensed elsewhere to receive a local license on a streamlined basis. *Id.* at 385 & n.10. Even accepting that (unlike New Jersey's requirement) New York's licensing requirement affected only speech, *see id.* at 392, the Second Circuit concluded first that New York's requirement is content-neutral, *id.* at 393, and second, that New York's licensing scheme both served a significant state interest and was sufficiently tailored to do so, *id.* at 398–403. New York's "interest in protecting its residents from incompetent or deceptive counselors" was meant to ensure "that persons really are licensed and in good standing in another state" before exempting them from New York's initial licensing requirements. *Id.* at 402. Similarly, a substantive check to ensure "that the out-of-state license was obtained by satisfying educational, experiential, and testing requirements comparable to New York's [was] sufficiently tailored to [New York]'s public health interest" to survive First Amendment scrutiny. *Id.* So too here.

To be sure, requiring a background check and substantive validation of a license might be more restrictive than simply "verifying that the out-of-state physician-specialist is in fact licensed through their home state's medical board." App. Br. 39. But a validation requirement is still necessary to ensure that a practitioner is "licensed and in good standing in another state," *Brokamp*, 66 F.4th at 402, and a background check offers legitimate information about an applicant's character that another State's medical board cannot necessarily provide—particularly as this State has no authority to manage the members of that medical board, and the rigor they apply. Just as in *Brokamp*, it is New Jersey's prerogative to confirm that their licenses were "obtained by satisfying educational, experiential, and testing requirements comparable to [New Jersey's]," rather than taking applicants at their word alone. 66 F.4th at 402.

The temporary relaxation of the licensure requirement during the pandemic—including waived fees and expedited processing—does not alter the analysis. *See* JA53–54 ¶ 63–68. The Second Circuit rejected the same contention in *Brokamp*. 66 F.4th at 382, 401. Rational-basis and intermediate scrutiny alike do not demand "the least restrictive or least intrusive means," *McCullen*, 573 U.S. at 486, only a "reasonable fit." *Capital Associated Indus. v. Stein*, 922 F.3d 198, 209–10 (4th Cir. 2019). It was entirely reasonable for the State to ease licensing burdens during the extraordinary circumstances of a global pandemic. *See Brokamp*, 66

F.4th at 401. Those temporary adjustments do not undermine the validity of the general rule. The licensure requirement thus survives under either rational-basis or intermediate scrutiny review.

## II. The Licensure Requirement Does Not Violate The Dormant Commerce Clause.

The Constitution allows Congress to "regulate Commerce" "among the several States." U.S. Const. art. I, §8. But this Clause has been interpreted to have "'a further, negative command'" that "'effectively forbid[s] the enforcement of certain state [economic regulations] even when Congress has failed to legislate on the subject.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (*NPPC*). That reflects "a principal reason for the adoption of the Constitution": "removing state trade barriers" that "notoriously obstructed the interstate shipment of goods" under the Articles of Confederation. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 515 (2019). The "dormant" Commerce Clause thus roots out "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *NPPC*, 598 U.S. at 369; *N.J. Staffing All. v. Fais*, 110 F.4th 201, 206 (3d Cir. 2024). But it was never intended "to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Huron Portland Cement Co. v. City of Detroit,* 362 U.S.

440, 443–44 (1960). So the focus remains on whether "a state law discriminates against out-of-state goods or nonresident economic actors." *Tennessee Wine*, 588 U.S. at 518.

Here, the district court rightly dismissed Appellants' dormant Commerce Clause claim. The licensure requirement is not an economic protectionist measure, and does not discriminate against interstate commerce—either on its face or in effect. That suffices to defeat this challenge, but at most, all that would be left is *Pike* balancing: the question whether the requirement burdens interstate commerce in a way "clearly excessive" in comparison to its local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Like other professional-licensing requirements that this Court has upheld, the licensure requirement easily passes that test because it poses only incidental burdens on interstate commerce while ensuring that New Jersey residents can all receive competent medical care, regardless of their doctor's residency.

## A. The Dormant Commerce Clause Does Not Apply Given The Lack Of Economic Protectionism.

"'[N]o disparate treatment, no disparate impact, no problem under the dormant commerce clause.'" *Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1059 (7th Cir. 2018). And here, there is no "'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).

To begin, there is simply no differential treatment that benefits in-state economic interests at the expense of out-of-state economic interests, so there is no "economic protectionism" under the dormant Commerce Clause. *NPPC*, 598 U.S. at 369. All physicians treating New Jerseyans—resident and nonresident alike—need a New Jersey medical license. *See* N.J. Stat. Ann. §45:1-62(b) (license requirement applies to "[a]ny health care provider" who uses telehealth to treat a patient in New Jersey); *see also id.* §45:1-61 (defining "health care provider" as "an individual who provides a health care service to a patient"). That is true whether the doctor lives in New Jersey and provides in-person care to New Jerseyans; whether she lives in New Jersey and treats New Jerseyans through telehealth; whether she lives in another State and travels to New Jersey to provide in-person care to New Jerseyans; or whether she lives in another State and treats New Jerseyans through telehealth. The treatment of New Jersey patients triggers the need for a New Jersey license—not the location of the doctor. Appellants thus cannot even deny that the requirement to obtain a license is a "facially neutral statute." App. Br. 42.

Nor is there anything protectionist about the licensure process itself. New Jersey does not make it harder for doctors who live in another State to obtain a license as compared to in-state doctors; instead, all physicians would apply to the same New Jersey Board of Medical Examiners for the same license based on the exact same legal preconditions. Those

preconditions have nothing to do with residency; instead, they go to ensuring minimum competency. If anything, that New Jersey adopted streamlined procedures for doctors who are already licensed in at least one other State means it will generally be *easier* for out-of-state doctors to get a New Jersey license. *See supra* at 4–5 (discussing two streamlined paths to obtain a medical license, including via the Interstate Medical Licensure Compact).

So "economic protectionism" is nowhere in sight. *NPPC*, 598 U.S. at 369. The licensure requirement does not "deprive[] out-of-state businesses of access to a local market"; it subjects everyone to the same licensure system to offer medical care. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 389 (1994). It does not "erect[] an economic barrier protecting a major local industry against competition from without the State." *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951). It does not force out-of-state companies "to 'surrender' whatever cost advantages they enjoyed against their in-state rivals." *NPPC*, 598 U.S. at 372 (discussing *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986)). And it does not "impede free market forces to shield in-state businesses from out-of-state competition." *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 (3d Cir. 2002). It simply ensures that care to New Jerseyans comes from professionals who meet minimum standards of competence.

Not only is there an evident lack of discrimination on the face of the licensure requirement, but the requirement also does not discriminate in effect. Indeed, this Court has repeatedly upheld state professional-regulation requirements that incidentally impose far greater burdens on professionals who operate in multiple States. In *Tolchin v. Supreme Court of New Jersey*, 111 F.3d 1099 (3d Cir. 1997), this Court rejected a dormant Commerce Clause challenge to New Jersey's requirement that attorneys maintain a "bona fide" office in the State because any "incidental discrimination" against "attorneys who maintain small or sporadic practices in New Jersey" (e.g., who instead mostly practice in other States) was not a form of residency discrimination but merely a rule whose impacts varied depending on "the size and type of an attorney's practice" in the State. *See id.* at 1106–11. And *Heffner v. Murphy*, 745 F.3d 56 (3d Cir. 2014), likewise rejected a challenge to Pennsylvania's law largely restricting ownership of funeral homes to licensed directors, who could not operate more than two places of business, *see id.* at 71, 73, 76. Since anyone living in any State could obtain a Pennsylvania funeral director's license, entry into Pennsylvania's market was limited "'only by the choices of the individual as to how best to allocate his or her time and resources,'" not by the residency of the applicant. *Id.* at 75 (quoting *Brown v. Hovatter*, 561 F.3d 357, 364 (4th Cir. 2009) (upholding similar Maryland rule)).

Appellants' efforts to distinguish these binding cases fall flat. They principally complain about the requirement to get a New Jersey license

when they already have another license in another State, but they cannot claim that the "burdens of obtaining a duplicative license" are distinct to them as non-residents. App. Br. 46. To the contrary, this alleged burden would apply as strongly to a doctor living in New Jersey who is already licensed in Pennsylvania—that resident doctor would still have to obtain a second New Jersey license to treat New Jersey patients, as Appellants are forced to admit. *See id.* In other words, whether a physician is burdened by a "duplicate" license depends on what other license a physician holds, not where she resides. *See Heffner*, 745 F.3d at 76 ("We cannot 'accept [the] notion that the Commerce Clause protects the particular structure or methods of operation in a retail market.'" (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978))). Nor does Appellants' attempt to distinguish the funeral business in *Heffner* as a local one, *see* App. Br. 47–48, carry weight. *Heffner* never relied on that principle to save Pennsylvania's law from heightened scrutiny, and Appellants here never attempt to argue that telemedicine is an intrinsically interstate enterprise, or that it is an "instrumentalit[y] of interstate transportation—trucks, trains, and the like." *NPPC*, 598 U.S. at 379 n.2. Just the opposite: medical practice and licensing is traditionally a highly state-dependent practice, *see supra* at 20, 23–24.[6]

---

[6] The fact that *Tolchin* and *Heffner* were decided on summary judgment is irrelevant because neither turned on any facts in the record. *Contra*

Beyond *Tolchin* and *Heffner*, this Court and its sister circuits have repeatedly rejected dormant Commerce Clause challenges to neutral licensure schemes. That includes this Court's decision in *Castille*, which upheld Pennsylvania's requirement that attorneys from non-reciprocal States needed to take the Pennsylvania bar exam, rather than being admitted to the bar by motion. 799 F.3d at 225. And circuit courts nationwide have reached similar results. *See, e.g., Brown*, 561 F.3d at 362–68; *Locke v. Shore*, 634 F.3d 1185, 1192–94 (11th Cir. 2011) (rejecting dormant Commerce Clause challenge where Florida's license requirement for interior designers did "not discriminate against out-of-state residents"); *Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Berch*, 773 F.3d 1037, 1048–49 (9th Cir. 2014) (upholding Arizona Bar's reciprocal admission system, because it "requires the same of its citizens as it does citizens of other states"); *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1039–43 (10th Cir. 2009) (similar).

All these cases point the same direction: the licensure rule burdens all practitioners, wherever they live, and regardless of whether they practice in-person or via telemedicine. A physician who lives and sees patients in Trenton must have a New Jersey license, whether an appointment is

---

App. Br. 45. Instead, in both cases, it was "as obvious as it [was] straightforward" from "the text of the statute that the challenged provisions impose the same limitation on" the relevant out-of-state and in-state actors. *Heffner*, 745 F.3d at 72.

in-person or online. A physician who lives in Cape May and provides telemedicine to a patient in Newark must bear the costs of New Jersey's licensure requirement as much as a physician who does the same from California. A physician who lives in New Jersey and commutes to practice in-person at a hospital in New York or Philadelphia faces similar burdens: she must also obtain a New Jersey license to practice telemedicine for New Jersey patients, even if licensed in another State. And a physician living in New York or Pennsylvania who commutes to New Jersey to treat patients in-person already needs a New Jersey license but need not obtain another license to provide telemedicine to New Jersey patients farther away. So having "made a rational decision that consumers in need of [telemedicine] are better served by licensed individuals," *Heffner*, 745 F.3d at 76, any incidental burden for a physician with another license "is not based on residency status," *Tolchin*, 111 F.3d at 1108, but on whether a physician chooses to "'allocate his or her time and resources'" to maintaining medical practices across multiple States, *Heffner*, 745 F.3d at 75 (quoting *Brown*, 561 F.3d at 364).

Against this overwhelming weight of authority, Appellants wrongly claim the licensure requirement nonetheless discriminates under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977). *See* App. Br. 42–45. *Hunt* held that a North Carolina law barring apples sold in-state from being marketed under a State's quality grades—rather than federal ones—violated the dormant Commerce Clause. 432 U.S. at

350–54. But none of the reasons underlying *Hunt* apply here. Most obviously, *Hunt* struck down North Carolina's law because it had the "consequence of raising the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected." *Id.* at 351. This licensure requirement, by contrast, does not discriminatorily raise costs or increase burdens: Unlike out-of-state apple growers who had to change their marketing practices to match in-state ones, both residents and nonresidents who treat New Jerseyans need New Jersey licenses.

Moreover, the requirements and costs are the same for resident and nonresident practitioners. For New Jersey doctors who maintain licenses in other States, the New Jersey licensure requirement is just as much an additional burden (to get a second license) as it is for out-of-state doctors licensed elsewhere. *See supra* at 37–42. Or, as the district court put it, "it is Drs. MacDonald and Gardner's desire to engage with potential patients in New Jersey and maintain relationships with existing patients in New Jersey that create the asserted burdens." JA16. But with residency irrelevant to the law, "[t]hat does not equate to discrimination against out-of-state residents." JA17 (citing *Tolchin*, 111 F.3d at 1108). "The question here is whether the licensure requirement falls equally on New Jersey and out-of-state physicians," and "[i]t unquestionably does." JA15 (citing *Heffner*, 745 F.3d at 72).

As a result, the licensure rule does not advantage in-state economic interests at the expense of similarly situated, out-of-state competitors. *See N.J. Staffing All.*, 110 F.4th at 206. There is nothing suspect about prohibiting out-of-state doctors from treating in-state residents without suitably demonstrating their fitness to practice medicine. That is the result of New Jersey regulating for "the health, life, and safety of [its] citizens." *Huron*, 362 U.S. at 443. The dormant Commerce Clause inquiry can end there. *See NPPC*, 598 U.S. at 367–68, 370–71, 391.

## B.  The Licensure Requirement Satisfies *Pike.*

At most, all that would remain is minimal scrutiny under *Pike* balancing. Under *Pike*, a law that "regulates even-handedly to effectuate a legitimate local public interest" and that has "effects on interstate commerce [that] are only incidental" must "be upheld unless the burden imposed on such commerce is clearly excessive to the putative local benefits." 397 U.S. at 142. Indeed, "the Supreme Court has not invalidated a law under *Pike* in more than 30 years." *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023). Appellants come nowhere close to establishing that this licensing requirement fails that standard.

As a threshold matter, the licensure rule is far from the type of restriction *Pike* guards against. *Pike* serves primarily to "'smoke out a hidden protectionism'" in a law that otherwise seems neutral. *NPPC*, 598 U.S. at 379. *Pike* balancing thus leads to the invalidation of "genuinely nondiscriminatory laws" in (at most) only a "small number" of cases. *Id.*

Such unlawful statutes typically have "impede[d] the flow of commerce" by burdening "instrumentalities of interstate transportation—trucks, trains, and the like," *id.* n.2, where such laws "undermined a compelling need for national uniformity in regulation," *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997). That is not so here: medicine is a field quintessentially subject to state-by-state regulation. *See supra* at 20, 23–24. So Appellants' challenge lands "well outside *Pike*'s heartland"—"not an auspicious start." *NPPC*, 598 U.S. at 379–80 & n.2.

There is a second, threshold problem: *Pike* is especially difficult to satisfy where, as here, Appellants attack a "safety regulation" that "thus carries a 'strong presumption of validity.'" *Locke*, 634 F.3d at 1194; *see also Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) ("[i]f safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce"). After all, "incidental burdens on inter-state commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623–24 (1978). Even so, the dormant Commerce Clause was "never intended to cut the States off from legislating on all subjects re-lating to the health, life, and safety of their citizens." *Tracy*, 519 U.S. at 306 (1997).

Appellants cannot overcome those hurdles. To start, as laid out in detail above, the licensure scheme is evenhanded: it applies to all practitioners who seek to treat New Jersey patients via telemedicine, regardless of their residency. *See supra* at 36–43. It does so to effectuate a "legitimate local public interest"—New Jersey's "exceedingly strong" one "in regulating the practice of medicine in its jurisdiction." *Zahl*, 282 F.3d at 211. The rule extends the same protection that New Jersey patients see doctors with "qualifications of learning and skill" in the context of telemedicine as they do in person. *Dent*, 129 U.S. at 122–23.

Accordingly, the burdens that the licensure requirement imposes do not "clearly" outweigh the interests that it advances. *Pike*, 397 U.S. at 142. Appellants assert that physicians face "substantial" additional burdens by becoming licensed in New Jersey, App.Br.50, and that the telemedicine rule reduces New Jersey patients' access to care, *id.* But the burdens on physicians are, at most, "incidental" ones attributable to their choices to maintain national medical practices that include New Jersey patients. *See Tolchin*, 111 F.3d at 1107–09; *supra* at 39. The dormant Commerce Clause allows these sorts of "unavoidable" and "incidental" accessories to "health and safety" legislation. *Philadelphia*, 437 U.S. at 623–24. And the argument that the licensure requirement impedes access to patient care also rings hollow: New Jersey has an interest in protecting patients from unqualified medical care, and therefore has discretion to ensure that those who "offer[] to the community [their] services

as a physician" do so with the requisite "learning and skill" that *it* (rather than some other State) requires. *Dent*, 129 U.S. at 123. Especially for presumptively valid health-and-safety regulations, *see Kassel,* 450 U.S. at 670, courts applying *Pike* generally "must not 'second guess the empirical judgment of lawmakers concerning the utility of legislation.'" *Tolchin*, 111 F.3d at 1110–11 (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987)).

Despite Appellants' contention to the contrary, New Jersey's relaxation of the rule during the pandemic does not impact the *Pike* balancing in this case. *See* Br. 51 (citing JA53–56 ¶¶ 65, 68, 76). The licensure rule assures that the State can maintain uniform licensing requirements for all physicians who provide medicine to New Jersey residents, and to obtain a baseline level of knowledge and competency. That the State saw fit to balance the costs and benefits of a licensure requirement one way during the temporary emergency, with atypical and urgent needs for additional access to medical care for its populace, does not mean that it is bound to those choices in non-emergent times: it has long been the case that licensing for physicians "may call for further conditions" as events that affect the practice of medicine—like new knowledge, or a novel public health threat—emerge or abate. *Dent*, 129 U.S. at 123.

At bottom, the licensure rule easily satisfies *Pike*. That is as true at the pleading stage is it would be at summary judgment. And so both this Court and others have not hesitated to affirm the dismissal of nonviable

dormant Commerce Clause claims at the pleading stage, both on threshold grounds and *Pike* balancing. *See, e.g.*, *NPPC*, 598 U.S. at 367–68; *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 670 (4th Cir. 2024); *Owner Operator Indep. Drivers Ass'n, Inc. v. Pa. Turnpike Comm'n*, 934 F.3d 283, 290 & n.6, 294 (3d Cir. 2019). The district court thus properly dismissed Appellants' dormant Commerce Clause claim here too.

## III. The Licensure Requirement Does Not Violate The Privileges And Immunities Clause.

The district court correctly dismissed Drs. MacDonald and Gardner's claim under the Privileges and Immunities Clause. The Privileges and Immunities Clause provides that "[t]he citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, §2. It thus prevents "discrimination against out-of-state residents on matters of fundamental concern." *United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of the City of Camden*, 465 U.S. 208, 220 (1984). To evaluate a Privileges-and-Immunities claim, the Court first asks whether the privilege at issue is "fundamental." *McBurney v. Young*, 569 U.S. 221, 226 (2013). If so, the Court then asks whether the State "discriminat[es] against nonresidents," and if it does, whether the State has a "substantial reason" to treat residents and nonresidents differently that bears a "substantial relationship to the government's objectives." *A.L. Blades & Sons, Inc. v. Yerusalim*, 121 F.3d 865, 870 (3d Cir. 1997). The licensure requirement

does not offend the Clause: even if it involves a fundamental privilege, it does not discriminate against out-of-state residents. And if it did, the Clause would still permit the licensure requirement because any burden imposed "on the privileges of nonresidents" bears a sufficiently "substantial relationship to the state's objective." *Castille*, 799 F.3d at 224. For largely the same reasons that Appellants' dormant Commerce Clause claim fails, Appellants' Privileges-and-Immunities claim fails too.

## A. The Licensure Requirement Is Neither Discriminatory Nor Protectionist.

That this licensing requirement does not discriminate against out-of-state practitioners is once again fatal. *See McBurney*, 569 U.S. at 227. If a restriction "imposes identical requirements on residents and nonresidents alike and it has no discriminatory effect on nonresidents, it does not violate the Privileges and Immunities Clause." *Tolchin*, 111 F.3d at 1111. And here, there is no discrimination against nonresidents. *See supra* at 36–44; JA17; *see also Tolchin*, 111 F.3d at 1113 (applying dormant Commerce Clause discriminatory effect analysis to Privileges and Immunities Clause claim); *Castille*, 799 F.3d at 224–25 (similar). All healthcare providers, residing in New Jersey or not, must obtain a license to offer telehealth services to New Jerseyans.

Contrary to Appellants' arguments, the licensure rule does not "impos[e] a disproportionate burden on nonresidents" or excessively burden

"out-of-state physician-specialists." App. Br. 53. The "burden" of New Jersey licensure applies to all physicians treating New Jerseyans, in-state doctors and out-of-state doctors alike. *See supra* at 39–43. And any expense associated with obtaining a New Jersey license in addition to that of another State is one New Jersey residents must also bear—it applies to anyone who seeks to treat patients in multiple States with licensure obligations, not based on where a doctor happens to live. *See supra* at 37–38, 40–43. So the law "treats [New Jersey] residents no differently than out-of-state residents." *Castille*, 799 F.3d at 225. Nor does it exist to "provide a competitive economic advantage for [New Jersey] citizens," *McBurney*, 569 U.S. at 228; it is designed to protect the health and safety of residents. *See supra* at 45. So because the Clause "does not require that a State tailor its every action to avoid any incidental effect on out-of-state trades[people]," *McBurney*, 569 U.S. at 229, the licensure requirement does not discriminate. The inquiry could end there.

### B. The Licensure Requirement Is Substantially Related to Important Government Interests.

This claim also fails regardless of whether the licensure rule is discriminatory, because the state law imposes no "disproportionately heavy burden on nonresidents" that "fail[s] to bear a substantial relationship to New Jersey's objective." *Tolchin*, 111 F.3d at 1113; *accord Castille*, 799 F.3d at 224. This inquiry must "be conducted with due regard for the princip[le] that the States should have considerable leeway in analyzing

local evils and in prescribing appropriate cures." *Toomer v. Witsell*, 334 U.S. 385, 397 (1948). That is especially true for health-and-safety issues, "primarily and historically matters of local concern" that the "States traditionally have had great latitude under their police powers to legislate." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (cleaned up).

The telehealth-licensing requirement comfortably clears this bar. Return to *Tolchin*. There, the burdens of maintaining a bona-fide office in New Jersey and attending in-person classes in the State were far more burdensome than the licensure requirements at issue here. *See supra* at 39–40; *Tolchin*, 111 F.3d at 1107–08. Those requirements nonetheless bore a sufficiently "substantial relationship to New Jersey's goal of regulating the practice of law to the benefit of the public" to survive under the Privileges and Immunities Clause. 111 F.3d at 1113. The licensure requirement here—in addition to its relatively light burden—advances New Jersey's "exceedingly strong interest in regulating the practice of medicine in its jurisdiction," *Zahl*, 282 F.3d at 211, by "assur[ing]" that practitioners "possess[] the requisite qualifications," *Dent*, 129 U.S. at 122–23. The district court reached this very conclusion, holding that "New Jersey has a strong interest in regulating the practice of medicine" and "that requiring state licensure in order to practice telemedicine bears a substantial relationship to that interest and does not impose too heavy a burden on nonresidents who wish to practice in New Jersey." JA22. It did so correctly.

Finally, although Appellants argue that dismissal was premature without more fact discovery, *see* App. Br. 55–56, the lack of a plausible Privilege and Immunities claim is evident on the face of the complaint. In such situations, courts—including this Court—routinely affirm the dismissal of Privileges-and-Immunities claims at the pleading stage. *See, e.g., Gattineri v. Town of Lynnfield*, 58 F.4th 512, 516 (1st Cir. 2023); *Sarasota Wine Market, LLC v. Schmitt*, 987 F.3d 1171, 1184–85 (8th Cir. 2021); *Willman v. Att'y Gen. of the United States*, 972 F.3d 819, 825 (6th Cir. 2020); *Yerger v. Mass. Tpk. Auth.*, 395 F. App'x 878, 885 (3d Cir. 2010); *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 103–04 (2d Cir. 2009). Appellants' claim was thus properly dismissed.

## IV. The Licensing Requirement Does Not Violate The Fourteenth Amendment.

The district court correctly dismissed Appellants' claim that the licensure rule violates Mr. Abell's Fourteenth Amendment due-process right to "direct the care, custody, and control" of his child, J.A., JA61–63 ¶¶ 101–09; *see also Troxel v. Granville*, 530 U.S. 57, 66 (2000). Third Circuit precedent—which holds that parental care-custody-control rights do not extend to the parents' choice of a particular healthcare provider regardless of qualification—forecloses this claim. *See Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 644–47 (3d Cir. 1995); *Doe*, 783 F.3d at 156. This Court should therefore affirm.

While the Fourteenth Amendment's Due Process Clause "'protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children,'" "[t]his liberty interest … is not absolute." *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 933 (3d Cir. 2011). This Court has accordingly explained that this fundamental care-custody-control right does not extend to a parent's choice of a particular medical provider. In *Sammon*, this Court rejected a Due Process challenge to New Jersey's midwifery-licensing requirement from parents seeking care from an experienced but unlicensed midwife. 66 F.3d at 641. Whatever interest the parents had in "selecting a midwife of their choice," it was not a "fundamental" one in light of the longstanding rule that "[s]tate restrictions on the right to practice a profession" and "restrictions on a patient's choice of particular health care providers are subjected only to rational basis review." *Id.* at 645. The parents thus had no constitutional right to their choice of unlicensed healthcare provider. *See id.* at 647.

Appellants' effort to distinguish *Sammon* is unpersuasive. It does not matter that *Sammon* involved "no alleged shortage of qualified midwives with state-favored credentials," whereas here, "the Complaint alleges that the telemedicine rule restricts J.A. from getting the most appropriate treatment for his rare cancer, not just the treatment that his father prefers." App. Br. 58–59. The *Sammon* court's decision was not based on those premises. *See* 66 F.3d at 645. Instead, it unqualifiedly

held that "parents have no constitutional right to their choice of a health care provider who does not meet quality control standards that a legislator might reasonably conceive to be desirable." *Id.* at 647. Just so here: New Jersey has adopted a neutral, licensing scheme for physicians, and Mr. Abell has no right to a doctor who refuses to comply.

This Court's decision in *Doe* only reinforces Appellants' lack of a Fourteenth Amendment claim. There, this Court rejected a Fourteenth Amendment care-custody-control claim from parents who sought conversion therapy for their children. *See* 783 F.3d at 156. Again recognizing the limit to these claims, this Court explained that "the case law does not support the extension of this right to a right of parents to demand that the State make available a particular form of treatment." *Id.* Appellants argue that *Doe* does not apply because Mr. Abell seeks to access care for which a physician is unavailable, rather than care that New Jersey has banned. App. Br.60–61. But this ignores that licensing requirements still reflect judgments about medical safety, and are designed to protect patients from the dangers of care administered by unlicensed professionals. New Jersey is free to find that the provision of medical care (and all its attendant risks) requires licensure, and to prohibit care by those who cannot or refuse to obtain it.

Whether framed in terms of a right to a particular provider or a particular type of care, creating a constitutional right on behalf of pa-

tients to receive health care services from their preferred providers—regardless of whether that provider is licensed to practice medicine in the patient's state—would be as disastrous as it is unworkable. If patients have a constitutional right to receive services in New Jersey from providers not licensed in the State, it would strip New Jersey's ability to stop incompetent or unqualified doctors from treating New Jerseyans. *See* N.J. Stat. Ann. §45:9-6 (specific education and training requirements). This would directly erode the valid, longstanding, and essential public health goals served by the State's professional licensure schemes. *Zahl*, 282 F.3d at 210–11; *Dent*, 129 U.S. at 122–23. And it would be contrary to a wall of precedent and this Nation's long historical tradition of neutral, basic regulation of medical care via licensure.

## CONCLUSION

This Court should affirm.

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:  /s/   Nathaniel F. Rubin

Nathaniel F. Rubin
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625-0112
(609) 789-2889

Dated: October 24, 2025

## CERTIFICATION OF BAR MEMBERSHIP

I certify that I am a member in good standing of the bar of the U.S. Court of Appeals for the Third Circuit.

/s/   <em>Nathaniel F. Rubin</em>
Nathaniel F. Rubin
Deputy Attorney General

Dated: October 24, 2025

## CERTIFICATION OF COMPLIANCE

Under Fed. R. App. P. 32(g) and L.A.R. 31.1(c), I certify that:

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 13,000 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced 14-point typeface using the Microsoft Word processing system.

3.     The text of this brief complies with L.A.R. 31.1(c) because it is identical to the text of the paper copies.

4.     This brief complies with L.A.R. 31.1(c) because the electronic file was scanned with the following anti-virus software: Crowdstrike Falcon Sensor, version 7.27.19907.0.

/s/   <em>Nathaniel F. Rubin</em>
Nathaniel F. Rubin
Deputy Attorney General

Dated: October 24, 2025

# CERTIFICATION OF SERVICE

I hereby certify that on this 24th day of October, 2025, I caused the Brief for Appellees to be filed with the Clerk of the U.S. Court of Appeals for the Third Circuit via electronic filing. Counsel of record will receive service via the Court's electronic filing system.

*/s/   Nathaniel F. Rubin*
Nathaniel F. Rubin
Deputy Attorney General

Dated: October 24, 2025