**Case No. 25-2090**

In the
# United States Court of Appeals
for the Third Circuit

SHANNON MACDONALD, M.D.; PAUL GARDNER, M.D.; J.A., A MINOR, BY AND THROUGH GUARDIAN AND NEXT FRIEND MICHAEL ABELL; MICHAEL ABELL; AND HANK JENNINGS,

*Plaintiffs-Appellants*,

vs.

PRESIDENT OF THE NEW JERSEY STATE BOARD OF MEDICAL EXAMINERS,

*Defendant-Appellee*.

ON APPEAL FROM THE U.S. DISTRICT COURT – DISTRICT OF NEW JERSEY
HON. EDWARD S. KIEL
CASE NO. 1:23-CV-23044-ESK-SAK

**BRIEF OF *AMICUS CURIAE* INSTITUTE FOR JUSTICE IN SUPPORT OF PLAINTIFFS-APPELLANTS' PETITION FOR REHEARING EN BANC**

Paul M. Sherman
Daniel Nelson
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
psherman@ij.org
dnelson@ij.org

*Counsel for Amicus Curiae Institute for Justice*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the undersigned counsel states that the Institute for Justice (IJ) is a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code, has no parent corporation, has issued no stock, and has no parents, trust, subsidiaries and/or affiliates that have issued shares or debt securities to the public.

Dated: September 21, 2026

/s/ Paul M. Sherman
Paul M. Sherman

*Counsel for Amicus Curiae Institute for Justice*

# TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT .................................................... ii

TABLE OF AUTHORITIES ......................................................................... iv

IDENTITY AND INTEREST OF AMICUS CURIAE ........................................ 1

SUMMARY OF ARGUMENT ......................................................................... 2

ARGUMENT................................................................................................. 3

I. The panel mistook a history of licensing physicians for a history of prohibiting unlicensed medical advice...................................................... 3

A. England rejected physicians' asserted monopoly over medical advice. ............................................................................................. 4

B. Early American licensure laws rarely gave licensees exclusive scope of practice and there is no evidence they were enforced against pure advice............................................................................ 5

C. Americans defended their freedom to choose medical advisers and secured repeal of exclusionary laws. ........................................... 6

II. *Vidal* does not relieve the State of its burden to establish a tradition of restricting unlicensed advice. ............................................................ 10

CONCLUSION .......................................................................................... 13

CERTIFICATE OF COMPLIANCE................................................................ 14

CERTIFICATE OF SERVICE....................................................................... 15

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Chiles v. Salazar*,
607 U.S. 627 (2026) .......... 12

*Fed. Election Comm'n v. Wis. Right to Life, Inc.*,
551 U.S. 449 (2007) .......... 12

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) .......... 11–12

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 11

*Veterans Guardian VA Claim Consulting LLC v. Platkin*,
133 F.4th 213 (3d Cir. 2025) .......... 1

*Vidal v. Elster*,
602 U.S. 286 (2024) .......... 10–11

## STATUTES

Act of Apr. 3, 1834, ch. 68, § 2, 1834 N.Y. Laws 72 .......... 8

Act of May 6, 1844, ch. 275, § 3, 1844 N.Y. Laws 406–07 .......... 8

## OTHER AUTHORITIES

*Arguments on the Medical Law*,
1 S. Botanic J. 74 (1838) .......... 7

B.W.S., *A Second Voice from New York*,
2 Thomsonian Recorder 252 (1834) .......... 7–8

Charles Coventry, *History of Medical Legislation*,
4 N.Y. J. Med. 151 (1845) .......... 8

Harold J. Cook, *The Rose Case Reconsidered: Physicians, Apothecaries, and the Law in Augustan England*, 45 J. Hist. Med. & Allied Sci. 527 (1990) ....................4–5

Institute for Justice, *Occupational Speech Cases,* https://ij.org/case/?pillar=occupational-speech .................... 1

James H. Cassedy, *Medicine in America: A Short History* (1991) .................... 5

Jeffrey Lionel Berlant, *Profession and Monopoly: A Study of Medicine in the United States and Great Britain* (1975) .................... 4

John Duffy, *From Humors to Medical Science: A History of American Medicine* (2d ed. 1993)....................5, 9

Jonathan Forman, *Dr. Alva Curtis in Columbus: The Thomsonian Recorder and Columbus' First Medical School*, 51 Ohio St. Archaeological & Hist. Q. 332 (1942) .................... 9

Joseph F. Kett, *The Formation of the American Medical Profession: The Role of Institutions, 1780–1860* (1968)....................5–6

Lewis A. Grossman, *Choose Your Medicine: Freedom of Therapeutic Choice in America* (2021) ....................5–7

Paul M. Sherman, *Occupational Speech & the First Amendment*, 128 Harv. L. Rev. F. 183 (2015), https://harvardlawreview.org/forum/vol-128/occupational-speech-and-the-first-amendment/ .................... 1

Paul Sherman & Daniel Nelson, *The (Weak) Historical Case for Licensing Speech*, 3 Texas A&M J. L. & Civ. Governance (forthcoming 2027), https://ssrn.com/abstract=6183159 .................... 3

Paul Starr, *The Social Transformation of American Medicine* (1982).................... 6

*Proceedings of the United States Thomsonian Convention; Convened at Columbus, in the State of Ohio, December 1832* (1833) .................... 9

*Report of the Minority Select Committee*, May 12, 1840 .................... 8

Richard Harrison Shryock, *Medical Licensing in America, 1650–1965* (1967)........................................................................................ 9

*The Democrat*, Apr. 12, 1832, https://www.newspapers.com/image/348716527/........................................... 7

*Transactions of the Medical Society of the State of New York* 265 (1868) ........... 8

William G. Rothstein, *American Physicians in the Nineteenth Century: From Sects to Science* (1972) ......................................................................6, 8

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Institute for Justice is a nonprofit legal center dedicated to defending freedom of speech and other constitutional rights. IJ has litigated dozens of cases nationwide defending people who speak for a living, and its attorneys have published scholarly work on the First Amendment principles that apply to this speech. *See* Institute for Justice, *Occupational Speech Cases,* https://ij.org/case/?pillar=occupational-speech; Paul M. Sherman, *Occupational Speech & the First Amendment*, 128 Harv. L. Rev. F. 183 (2015), *available at* https://harvardlawreview.org/forum/vol-128/occupational-speech-and-the-first-amendment/. IJ recently participated as amicus in *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213 (3d Cir. 2025), a case raising related First Amendment questions. IJ's attorneys have also extensively researched the history of occupational licensing, including specifically the history of government regulation of medical advice. IJ believes that its original historical research and First Amendment expertise will assist the Court both in identifying the historical questions necessary to resolve this appeal and in answering those questions correctly.

[1] No party's counsel authored any portion of this brief. No party or person—other than *amicus*—contributed money intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

The panel correctly held that medical advice is speech and that New Jersey's licensing requirement, as applied to Plaintiffs, restricts that speech based on its content. Op. 6–13. Those conclusions ordinarily require strict scrutiny. Yet the panel applied intermediate scrutiny, basing its decision on what it described as a long tradition of licensing physicians, whose work during the 18th and 19th centuries consisted largely of speech. Op. 16–23.

That reasoning asks the wrong historical question. The physician plaintiffs in this case wish to speak to New Jersey residents without being licensed there. The correct historical question, then, is not whether there is some general history of regulating physicians or whether their work often consisted of speech, but whether unlicensed speakers were prohibited from giving medical advice.

They were not. The historical record supplies no established tradition of prohibiting advice alone. Unlicensed Americans routinely advised patients, and even broader efforts to exclude them from medical practice met sustained resistance. Americans defended their choice of practitioners as a matter of conscience, thought, and inquiry, securing repeal of exclusionary laws. That history refutes any claim that the State has carried its burden of establishing an exception to strict scrutiny.

# ARGUMENT

## I. The panel mistook a history of licensing physicians for a history of prohibiting unlicensed medical advice.

The panel inferred a tradition of restricting medical advice from the speech physicians historically provided. English physicians generally diagnosed and prescribed while leaving manual tasks to surgeons and apothecaries. Op. 16. Extending that reasoning to America, the panel asserted: "Simply put, conditions on the right to practice medicine were conditions on the right to speak about specific content and convey specific messages." Op. 18.

That assertion is incorrect. Our examination of colonial and state licensing laws, medical societies' records, and court decisions—from the Founding through ratification of the Fourteenth Amendment—uncovered no American prosecution or penalty for giving medical advice alone without a license, and the panel identifies none until the 20th century.[2] The history instead shows that unlicensed people routinely advised patients. Licenses generally conferred credentials or privileges without excluding others from practice. Even the exceptional laws purporting to prohibit unlicensed practice were undermined by exemptions, resistance to enforcement, and eventual repeal.

[2] The historical discussion is adapted from Paul Sherman & Daniel Nelson, *The (Weak) Historical Case for Licensing Speech*, 3 Texas A&M J. L. & Civ. Governance (forthcoming 2027), https://ssrn.com/abstract=6183159.

None of that establishes a settled tradition of requiring governmental permission to give medical opinions or of exempting those opinions from the full protection of the First Amendment. On the contrary, the relevant history shows Americans exercising and defending their freedom to consult unlicensed advisers from before the Founding until well after ratification of the Fourteenth Amendment.

### A. England rejected physicians' asserted monopoly over medical advice.

Resistance to a physician monopoly on medical advice stretches back to before the American Founding. In England, the Royal College of Physicians' 1518 charter authorized it to license physicians in London and its vicinity, and the College claimed that its monopoly encompassed diagnosis and advice. Yet Londoners routinely consulted apothecaries and other unlicensed practitioners. Jeffrey Lionel Berlant, *Profession and Monopoly: A Study of Medicine in the United States and Great Britain* 135–37, 142–43 (1975).

When the College Censors tried to enforce its claimed monopoly against London apothecary William Rose, the apothecaries objected that the College's theory would force Londoners to purchase physicians' advice for minor ailments regardless of their wishes or ability to pay. Harold J. Cook, *The Rose Case Reconsidered: Physicians, Apothecaries, and the Law in Augustan England*, 45 J. Hist. Med. & Allied Sci. 527, 547–48 (1990). The Lords ultimately agreed,

rejecting the physicians' claimed monopoly and allowing apothecaries to continue advising patients. *Id.* at 553–54.

### B. Early American licensure laws rarely gave licensees exclusive scope of practice and there is no evidence they were enforced against pure advice.

The freedom to obtain medical care as well as advice from unlicensed practitioners was even broader in the American colonies. Colonial medicine included domestic practitioners such as ministers, midwives, and neighbors reputed to possess medical skill. Where licensing existed, it generally provided honorary credentials rather than permission to practice, leaving unlicensed advisers almost entirely unregulated. Joseph F. Kett, *The Formation of the American Medical Profession: The Role of Institutions, 1780–1860*, at 3, 7 (1968). Laypeople also advised one another using medical guides written for ordinary readers, which far outnumbered guides for physicians. James H. Cassedy, *Medicine in America: A Short History* 14–15 (1991).

The colonies' rare efforts to impose exclusive licensing failed to displace that tradition of freedom. New York enacted broader restrictions in 1760, limited to New York City, and New Jersey followed in 1772. But by all accounts these laws were neither popular nor enforced. John Duffy, *From Humors to Medical Science: A History of American Medicine* 40 (2d ed. 1993). "Therefore, on the eve of the Revolution, no effective constraint on practice by unorthodox and untrained

doctors existed in the American colonies." Lewis A. Grossman, *Choose Your Medicine: Freedom of Therapeutic Choice in America* 15 (2021).

Independence brought additional licensing laws without generally excluding unlicensed people from practice. By 1830, 13 of 24 states had licensing laws. Kett, *supra*, at 13. Yet "virtually all" adopted honorary schemes that left unlicensed practitioners free to practice. William G. Rothstein, *American Physicians in the Nineteenth Century: From Sects to Science* 72 (1972). Legislatures "were unwilling to enact laws which would have seriously deterred unlicensed practitioners." *Id.* at 76. The most common restriction merely barred suits to collect unpaid fees, which practitioners could and did avoid by requiring advance payment. *Id.*; Kett, *supra*, at 21. These laws did not prohibit or punish giving unlicensed advice.

The exceptional laws authorizing fines or imprisonment for unlicensed practice were rarely enforced and appear never to have been enforced against pure advice. Broad exemptions limited their reach, and juries resisted enforcement against unlicensed practitioners. Paul Starr, *The Social Transformation of American Medicine* 43–44 (1982); Rothstein, *supra*, at 76–78.

**C. Americans defended their freedom to choose medical advisers and secured repeal of exclusionary laws.**

The absence of any record of enforcement against pure advice accords with early Americans' insistence that they had a right to choose whose medical

judgment to consult. Americans opposed exclusionary licensing because it interfered with conscience and inquiry. Benjamin Rush, the leading physician of the early national period, objected that licensing compelled patients to accept physicians' opinions, which he compared to compelling religious opinions. Grossman, *supra*, at 7, 19. His objection addressed the freedom to decide whose advice to hear and which medical theories to accept.

Patients themselves invoked that freedom in demands for repeal. New Jerseyans, in an early-1830s petition, declared that "in matters which concern our LIVES . . . it should be our privilege, to choose such Physicians for our relief, as we have most confidence in." Grossman, *supra*, at 32. Thousands of Alabama petitioners likewise asserted their right to employ physicians of their choice. *The Democrat*, Apr. 12, 1832, at 1, *available at* https://www.newspapers.com/image/348716527/. South Carolina petitioners of the same era compared licensing a preferred medical sect to licensing a "particular denomination" of ministers, insisting that both violated "liberty of conscience." *Arguments on the Medical Law*, 1 S. Botanic J. 74 (1838).

Opponents expressly invoked freedom of speech against laws excluding competing medical practitioners. An 1834 New York writer defending Thomsonianism, an alternative medical system, declared: "Legislatures may enact laws against Thomsonianism, but, thank heaven, they cannot bind the mind of

man. No! For freedom of thought and speech are the unalienable rights of man." B.W.S., *A Second Voice from New York*, 2 Thomsonian Recorder 252 (1834). Americans thus defended their freedom to hear and follow medical opinions even when their chosen practitioners lacked official approval.

New York's repeal of its licensing law demonstrates the force of those arguments in the antebellum era. After the State prohibited unlicensed practice for "fee or reward" in 1834, tens of thousands petitioned for repeal. Act of Apr. 3, 1834, ch. 68, § 2, 1834 N.Y. Laws 72; *Report of the Minority Select Committee*, May 12, 1840, reprinted in *Transactions of the Medical Society of the State of New York* 265 (1868). A legislative committee report likewise reasoned that citizens "cannot be legislated out of one religion and into another," drawing a parallel to imposing unwanted medical treatment. *Id.* And a senator urged repeal because New Yorkers wanted "no protection but freedom of inquiry and freedom of action." Charles Coventry, *History of Medical Legislation*, 4 N.Y. J. Med. 151, 160 (1845). These arguments carried the day, and in 1844, the legislature repealed the prohibition while preserving criminal liability "in cases of mal-practice, or gross ignorance, or immoral conduct." Act of May 6, 1844, ch. 275, § 3, 1844 N.Y. Laws 406–07.

Other states also abandoned exclusion after citizens asserted their freedom to choose practitioners. Alabama repealed its law in 1832. Rothstein, *supra*, at 333. A

Thomsonian convention in Ohio denounced licensing laws as "unconstitutional" for "coercing opinions and binding the consciences of men." *Proceedings of the United States Thomsonian Convention; Convened at Columbus, in the State of Ohio, December 1832*, at 21, 37 (1833). Ohio repealed its law shortly afterward. Jonathan Forman, *Dr. Alva Curtis in Columbus: The Thomsonian Recorder and Columbus' First Medical School*, 51 Ohio St. Archaeological & Hist. Q. 332, 335 (1942).

By Reconstruction, this resistance had defeated the first American licensing experiment. Nearly all states had repealed their licensing laws before the Civil War; New Jersey followed in 1864. Duffy, *supra*, at 140–41; Richard Harrison Shryock, *Medical Licensing in America, 1650–1965*, at 30–31 (1967). The Fourteenth Amendment was thus ratified against that background of generally open medical practice.

That freedom extended to medical practice generally. For advice alone, neither the panel nor the State identifies evidence of an established prohibition during this period. Exclusive, durable regimes prohibiting unlicensed people from medical practice emerged principally in the 1880s and 1890s.[3] But even the emergence of those regimes does not establish when they began to reach advice

---

[3] The panel identifies an earlier revival, Op. 19–20, but North Carolina's 1859 board could not punish unlicensed practice, and broad exemptions undermined later laws in South Carolina and New York. Duffy, *supra*, at 218–20.

alone. The panel's examples of applying licensing laws to diagnoses and advice, for example, do not begin until 1907. Op. 20–21.

### II. *Vidal* does not relieve the State of its burden to establish a tradition of restricting unlicensed advice.

The panel's reliance on *Vidal v. Elster*, 602 U.S. 286 (2024), does not cure that historical defect. Op. 15–16, 22. From colonial America through ratification of the Fourteenth Amendment, the record shows no settled prohibition on unlicensed medical advice and sustained resistance to excluding unlicensed practitioners. That history bears no resemblance to the tradition that supported *Vidal*.

In *Vidal*, the Supreme Court upheld a restriction on registering another living person's name as a trademark without consent. 602 U.S. at 301–05. The Court did not infer that restriction's validity merely from the long history of trademark regulation. It examined the specific tradition of restricting trademarks in names and confined its holding to the names clause. *Id.* at 301–05, 310. That specific tradition operated against a background of content-based trademark regulation whose "longstanding, harmonious relationship" with the First Amendment supported departing from strict scrutiny. *Id.* at 299.

As the history discussed in Section I shows, there was no similarly longstanding, harmonious relationship when it came to the regulation of medical advice. Contrary to the panel's ruling, the repeal movement of the 1830s was not a "temporary swing in momentum," Op. 19, but an outraged and successful reaction

to laws that Americans believed violated their freedom of thought, speech, and conscience.

The history here also differs from *Vidal* because medical advice was commonplace long before the Founding. Trademark law developed slowly as interstate commerce expanded, making later regulatory efforts more relevant to the Court's inquiry. 602 U.S. at 296–97. Here, by contrast, Americans routinely obtained advice from unlicensed speakers from long before the ratification of the First Amendment until long after the ratification of the Fourteenth. The absence of an established prohibition, coupled with that ordinary practice and the sustained defense of conscience and inquiry, is thus strong evidence against any historical exception.

Because content-based restrictions are "presumptively invalid," the State bore the burden of rebutting that presumption. *United States v. Stevens*, 559 U.S. 460, 468 (2010). And it could not do so merely by pointing to the long history of licensing as applied to forms of medical conduct. *Id.* at 468–69 (holding that longstanding prohibitions on animal cruelty did not establish a tradition of prohibiting depictions of it). Instead, the State was required to establish a tradition of prohibiting unlicensed medical *advice*. Without evidence of that tradition, the State cannot justify reduced protection. *See Nat'l Inst. of Fam. & Life Advocs. v.*

*Becerra*, 585 U.S. 755, 767–68 (2018); *Chiles v. Salazar*, 607 U.S. 627, 649–52 (2026).

The State's failure to carry this burden is no surprise, because the relevant history shows Americans exercising and defending their freedom to consult unlicensed advisers from before the Founding through ratification of the Fourteenth Amendment. And to the extent the panel believed the Founding evidence showed some "indeterminacy of original meaning," Op. 22—a claim that Amicus disputes—any such indeterminacy should have weighed against the State, not against the Plaintiffs. "Where the First Amendment is implicated, the tie goes to the speaker, not the censor." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 474 (2007) (plurality opinion).

## CONCLUSION

This Court should grant rehearing en banc, vacate the panel's First Amendment disposition, reverse the dismissal of Plaintiffs' First Amendment claims, and remand for application of strict scrutiny.

Dated: September 21, 2026

Respectfully submitted,

/s/ Paul M. Sherman
Paul M. Sherman
Daniel Nelson
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
psherman@ij.org
dnelson@ij.org

*Counsel for Amicus Curiae Institute for Justice*

## CERTIFICATE OF COMPLIANCE

I certify the following:

1. Every attorney whose name appears on the brief is a member of the bar of this court.
2. This brief complies with the type-volume limitation of Rule 29(b)(4) of the Federal Rules of Appellate Procedure because this brief contains 2,506 words.
3. This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.
4. A virus detection program has been run on the electronic version of the brief and no virus was detected. The virus protection program used was Bitdefender Endpoint Security Tools, Product version 8.26.9.668, Security content version 7.101548, Released: 09/21/2026.
5. An identical copy of this brief was e-filed using the Court's CM/ECF electronic filing system.

Dated: September 21, 2026

/s/ Paul M. Sherman
*Counsel for Amicus Curiae*
*Institute for Justice*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2026, I caused the foregoing BRIEF OF *AMICUS CURIAE* INSTITUTE FOR JUSTICE IN SUPPORT OF PLAINTIFFS-APPELLANTS' PETITION FOR REHEARING EN BANC to be filed electronically with the Clerk of the Court of the United States Court of Appeals for the Third Circuit by using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: September 21, 2026

/s/ Paul M. Sherman
*Counsel for Amicus Curiae*
*Institute for Justice*